## SEVEN ISLANDS LAND COMPANY

v.

## MAINE LAND USE REGULATION COMMISSION [1].

Supreme Judicial Court of Maine.

Argued Sept. 10, 1981.

Decided Sept. 17, 1982.

1. Since the defendants named in the original complaint, Charles Blood *et al.*, were sued only in their official capacity as members of the Maine Land Use Regulation Commission, that commission is here substituted as the named defendant.

Eaton, Peabody, Bradford & Veague, Bernard J. Kubetz (orally), Daniel G. McKay, Bangor, for plaintiff.

James E. Tierney, Atty. Gen., Paul Stern, Asst. Atty. Gen. (orally), Augusta, for defendant.

Before McKUSICK, C. J., and GODFREY, NICHOLS, ROBERTS, CARTER and WATHEN, JJ.

PER CURIAM.

Plaintiff Seven Islands Land Company ("Seven Islands") brought this suit in the Superior Court (Kennebec County) to review the action of defendant Maine Land Use Regulation Commission ("LURC") in granting to it only a restricted permit for timber harvesting on certain woodlands located in an unorganized township in central Aroostook County. The Superior Court affirmed the LURC decision, rejecting Seven Islands' arguments (i) that the administrative decision was not supported by substantial evidence of record, (ii) that the continuous and long-term use of the lands at issue as a commercial forest constituted a preexisting nonconforming use that the controlling statute, 12 M.R.S.A. § 685–A(5) (1981), grandfathered out of regulation by LURC, and (iii) that the restrictions imposed by LURC upon the timber harvesting permit violated both the due process clauses and the taking clauses of the Maine and United States Constitutions. On appeal the Law Court rejects the same arguments repeated here by Seven Islands and affirms the Superior Court's judgment.

Pursuant to legislation first enacted in 1969 and substantially revised in 1971, LURC has authority for land use regulation in unorganized and deorganized portions of the state, including Township 13, Range 5 W.E.L.S. ("T. 13, R. 5"). 12 M.R.S.A. §§ 683–89 (1981). Acting under a legislative directive, *id.* § 685–A(6), LURC zoned certain land in that township, known as the Burpee Brook deer yard, as an Interim P–4 Protection Subdistrict. The effect of that zoning, which was designed to protect the deer wintering habitat, was to foreclose timber harvesting within that district except with a permit issued by LURC pursuant to 12 M.R.S.A. § 685–B (1981).

In October, 1979, Seven Islands, a land management company, filed on behalf of its principals, the land owners,[2] an application for a LURC permit to harvest timber on

---

**2.** At the appropriate place on LURC's form application for a forestry operation permit, Seven Islands as applicant identified itself as the land manager of the 662 acres proposed to be cut and further identified "Trs. u/w Maria Wheatland, et als" as the owners of that forest land. FOP 390 was issued to Seven Islands as applicant. Seven Islands brought the action for judicial review in the Superior Court "as agent for and on behalf of" 36 different sets of trustees specifically identified in the caption of the complaint, who by uncontested allegation of the complaint own the land at issue and engage Seven Islands to act in their behalf in managing it. The Superior Court found that the entire T. 13, R. 5, consisting of about 25,000 acres, is owned by "the plaintiffs."

662 acres of land situated in the Burpee Brook protection subdistrict.[3] LURC held extensive public hearings at which it received over 500 pages of testimony (with some 70 exhibits) from representatives of the applicant Seven Islands and of the Department of Inland Fisheries and Wildlife ("the Department"), as well as from several LURC-employed consultants, expert in the fields of forestry, wildlife management, and entomology. On June 18, 1980, LURC issued to Seven Islands its Forestry Operations Permit 390 ("FOP 390"), a complex 17-page document that both sets forth the limitations imposed upon the cutting permit and explains the reasons for LURC's imposing those limitations. The 662 acres covered by FOP 390 are broken into eight areas and numerous subareas, and the extent of cutting permitted in each is adjusted depending upon the extent of dead and dying fir and the specifically focused need as found by LURC in each area or subarea for maintaining winter cover for deer. In the aggregate, LURC authorizes unrestricted timber harvesting on 112 acres and cutting on another 432 acres of all fir that is dead or likely to die within two years. Harvesting on the remaining 118 acres is prohibited. However, in all areas where FOP 390 restricts or prohibits harvesting, Seven Islands may remove trees that have a high risk of blowdown or that are determined, after consultation with a representative of the Department, to be not contributing to winter deer shelter. Furthermore, Seven Islands in the future may apply for additional cutting "necessary to avoid substantial loss of economic value" from further deterioration of tree condition. In conclusion, LURC found:

> The permitted harvesting prescribed [in FOP 390] provides for the conservation at this time of a reasonable amount of remaining deer wintering habitat in this

area, while also enabling the landowner to make reasonable economic use of his property.

Displeased with the restrictions placed by LURC upon its timber harvesting within the 662 acres involved in its permit application, Seven Islands sought judicial review in the Superior Court pursuant to 12 M.R.S.A. § 689 (1981) and 5 M.R.S.A. §§ 11001–08 (1979 & Supp.1981). The Superior Court affirmed the administrative decision and Seven Islands has appealed to this court. Independently reviewing the action of LURC, we also find no reversible error in the restricted permit granted Seven Islands for timber harvesting in the Burpee Brook deer yard.

### I. Substantial Evidence

Seven Islands contends that LURC's decision is not based upon substantial evidence, requiring reversal pursuant to 5 M.R.S.A. § 11007(4)(C)(5) (1979).[4]

 In applying the "substantial evidence" standard of review to an agency action, the reviewing court must examine the entire record "to determine whether on the basis of all the testimony and exhibits before the agency it could fairly and reasonably find the facts as it did." *In re Maine Clean Fuels, Inc.,* Me., 310 A.2d 736, 741 (1973). The fact that the record contains inconsistent evidence or that inconsistent conclusions could be drawn from the record does not prevent the agency's findings from being sustained if there is substantial evidence to support them. *Id.* This court will not substitute its judgment for LURC's where there may be a reasonable difference of opinion. *Id.; see also* 4 R. Anderson, *American Law of Zoning* 25–26 (2d ed. 1977). The burden of proof clearly rests with the party seeking to overturn the decision of an administrative agency. *See*

---

3. Prior to filing the present application, Seven Islands had, under permits from LURC, cut timber on some 1000 acres out of the 2700 acres encompassed in the Burpee Brook deer yard. In its decision here on review, LURC found:

> Past harvesting activities within the bounds of the deer wintering area have significantly

reduced the size of currently suitable winter habitat.

4. Section 11007(4)(C)(5) states that a reviewing court may reverse an agency decision that is "unsupported by substantial evidence on the whole record."

*Central Maine Power Co. v. Waterville Urban Renewal Authority*, Me., 281 A.2d 233 (1971).

■ Seven Islands does not allege that the record lacks any evidence to support the agency's decision. Rather, the claim is merely that LURC rejected Seven Islands' evidence where its data was inconsistent with that of the Department and that the Department's data was not reliable.

This argument fails for two reasons. First, Seven Islands has pointed to no specific inconsistency between the two sets of data. As LURC found, the Department data was simply more detailed and specific than that of Seven Islands.[5]

Second, even if the inconsistencies alleged did in fact exist, Seven Islands' challenge of the LURC decision would fail because, as a matter of law, inconsistent evidence alone does not preclude a finding of substantial evidence, *In re Maine Clean Fuels, Inc., supra* at 741, and an examination of the record reveals evidence sufficient to support the decision.[6]

## II. *Nonconforming Use*

Seven Islands claims a right to unrestricted timber harvesting on the property in question, as a nonconforming use under 12 M.R.S.A. § 685–A(5) (1981).[7]

The Superior Court rejected this claim, holding 1) that Seven Islands' interpretation of the statute was "inconsistent with LURC's establishment and zoning of Protection Districts" and 2) that "this grandfathering provision is limited to actual use of particular property at the time of enactment of the LURC [standards] rather than potential uses . . . ." We agree.

■ This "grandfather" clause must be read in the context of the entire statutory scheme. The court interprets a statute in light of its evident purpose so that all of its provisions are read in harmony and are effectuated. *Dobbs v. Maine School Administrative District No. 50,* Me., 419 A.2d 1024, 1028 (1980); *Labbe v. Nissen Corp.,* Me., 404 A.2d 564, 567 (1979).

The land use regulation law directs that the unorganized territory be zoned into protection, management, or development districts representing the appropriate uses of the respective areas. 12 M.R.S.A. § 685–A(1). Protection districts are defined as

[a]reas where *development* would jeopardize significant natural, recreational and historic resources, including, but not limited to, flood plains, precipitous slopes, wildlife habitat and other areas critical to the ecology of the region or State.

(Emphasis added) 12 M.R.S.A. § 685–A(1)(A). Development is defined as

*any* land use activity or activities directed toward using, reusing or rehabilitating air space, land, water, or other natural resources . . . .

(Emphasis added) 12 M.R.S.A. § 682(7) (1981). Clearly, timber harvesting falls within the definition of development.

The definition of protection districts may be contrasted with that of management districts, which are defined as

[a]reas which are appropriate for *commercial forest product or agricultural uses* and for which plans for additional development are not presently formulated nor additional development anticipated.

(Emphasis added) 12 M.R.S.A. § 685–A(1)(B). Further, 12 M.R.S.A. § 685–A(5)

---

5. Essentially, the Department "broke the area down into smaller units than Seven Islands did." The reason was that there is great variation within individual areas, a fact acknowledged at the hearing by a Seven Islands witness.

6. Seven Islands asserts that the Department data should be disregarded because it was compiled by persons who are not licensed foresters, and hence unqualified. However, those responsible for the Department data are not lack-

ing in relevant credentials, training, or experience. LURC was entitled to believe the evidence they presented, since, as it found, their data appeared "to be credible, reliable and even painstaking in its specificity."

7. Section 685–A(5) reads in part as follows: No land use standard shall deprive any owner or lessee or subsequent owner or lessee of any interest in real estate of the use to which it is lawfully devoted at the time of adoption of said standard.

provides: "land use standards adopted pursuant to this chapter for *management districts* shall in no way limit the right, method or manner of cutting or removing timber or crops . . . ."[8] (Emphasis added)

Taken together, these provisions evince a clear legislative plan to set aside protection districts where timber harvesting may be regulated or prohibited altogether, and management districts where such harvesting may not be restricted.[9]

Seven Islands argues that the mere fact that a standing forest exists and is being maintained by its owners for later commercial harvesting means that the land is "devoted" to timber harvesting and therefore a nonconforming use under section 685–A(5). Seven Islands reasons that timber harvesting should be given special consideration under the statute because trees are similar to a farm crop that is cared for and is harvested only at maturity. This argument wholly ignores the legislative scheme. To adopt the construction that Seven Islands urges upon the court would be to place *all* standing forest land beyond the regulation of the commission, since all forest is potentially suitable for harvesting timber. Such a construction would automatically put most of the territory of the unorganized and deorganized portion of the state forever beyond the reach of protective district regulation by LURC. It would render the concept of protection districts meaningless and indistinguishable from that of management districts.

Still further, Seven Islands' definition of "nonconforming use" finds no support in general principles of zoning law. To qualify for "nonconforming" status, a

use must be actual and substantial. 1 R. Anderson, *supra* at § 6.19, 6.22; 4 A. Rathkopf, *The Law of Zoning and Planning* ch. 58, § 2 (4th ed. 1982). The burden of proving such is on the nonconforming user and the determination is made on a case-by-case basis. 12 M.R.S.A. § 685–B(7) (1981); 1 R. Anderson, *supra,* § 6.09. Where the activity is merely preparation for use, it does not rise to the level of being actual or substantial for the purposes of nonconformity. *Brennan v. Saco Construction, Inc.,* Me., 381 A.2d 656, 659–60 (1978); 1 R. Anderson, *supra,* § 6.22.

Seven Islands does not allege that it was engaged in cutting, or even marking trees to be cut, on the date the area in question was zoned for protection as a deer yard. The maintenance of a commercial forest for future timber harvesting is, of course, a use of the land, but it is not timber harvesting itself, for which use a LURC permit is required. The mere maintenance of a commercial forest is at best preparation for the "use" of the land for timber harvesting.

### III. *Constitutionality*

Seven Islands has attacked LURC's decision as 1) an unconstitutional "taking" without just compensation in violation of the fifth and fourteenth amendments to the United States Constitution and article I, section 21 of the Maine Constitution and 2) a violation of the substantive due process guarantees of the fourteenth amendment to the United States Constitution and article I, section 6–A of the Maine Constitution. These provisions are conceptually distinct and will be dealt with separately.

---

**8.** Moreover, when the legislature adopted the present land use regulation law, it abandoned a zoning scheme which prohibited the commission from restricting timber harvesting on any land without the owner's consent. *See* former 12 M.R.S.A. §§ 686(4)(A), 686(7), as enacted by P.L. 1969, ch. 494; repealed P.L. 1971, ch. 457, § 7.

**9.** Seven Islands relies heavily on post-enactment remarks of a senatorial sponsor of the

present land use regulation law, in which he indicated that the 1971 amendments to the statutes left timber harvesting unregulated. *See* 2 Leg.Rec. 4192–93 (1971). Since the legislature's intent is clear on the face of the statute, we find no need to resort to the legislative history. In any event, post-enactment comments are not legally cognizable legislative history. *See* 2A C. Sands, *Sutherland Statutory Construction* § 48.14–48.16 (4th ed. 1973).

482

## A. "Taking"

Both the United States and the Maine Constitutions prohibit the government from taking private property for public purposes without just compensation. The traditional statement of the rule applicable to the constitutionality of "taking" was formulated by Justice Holmes in *Pennsylvania Coal Co. v. Mahon*, 260 U.S. 393, 415–16, 43 S.Ct. 158, 160, 67 L.Ed. 322 (1922): "The general rule at least is that while property may be regulated to a certain extent, if regulation goes too far it will be recognized as a taking." "[W]hether a particular restriction will be rendered invalid by the government's failure to pay for any losses proximately caused by it depends largely 'upon the particular circumstances [in that] case'." *Penn Central Transportation Co. v. New York City*, 438 U.S. 104, 124, 98 S.Ct. 2646, 2659, 57 L.Ed.2d 631 (1978). Thus, the principal focus of the courts in "taking" cases has become a factual inquiry into the substantiality of the diminution in value of the property involved.

In recent years, the Supreme Court of the United States has required the diminution to be very substantial indeed before a taking will be found. *See Agins v. Tiburon*, 447 U.S. 255, 100 S.Ct. 2138, 65 L.Ed.2d 106 (1980); *Pruneyard Shopping Center v. Robins*, 447 U.S. 74, 100 S.Ct. 2035, 64 L.Ed.2d 741 (1979); *Andrus v. Allard*, 444 U.S. 51, 100 S.Ct. 318, 62 L.Ed.2d 210 (1980). Since ownership consists of a "bundle" of property rights, the mere extinguishment of one of those rights does not necessarily amount to a taking without compensation. The question is whether the right in question constitutes "a fundamental attribute of ownership" such that its extinguishment would render the property substantially useless. *Agins v. Tiburon, supra* 447 U.S. at 262, 100 S.Ct. at 2142.[10]

The proper procedure for analyzing taking questions is to determine the value of the property at the time of the governmental restriction and compare that with its value afterwards, to determine whether the diminution, if any, is so substantial as to strip the property of all practical value. *Lovequist v. Conservation Commission of Town of Dennis*, 379 Mass. 7, 393 N.E.2d 858, 866 (1979). In determining the amount of diminution, the focus is on the interference with the rights in the parcel as a whole, not merely the portion immediately affected. *Penn Central Transportation Co. v. New York City, supra* 438 U.S. at 130–31, 98 S.Ct. at 2662–63; *Foss v. Maine Turnpike Authority*, Me., 309 A.2d 339 (1973). Where timber is involved, the trees affected are to be considered as part of the property's market value. *Timberlands, Inc. v. Maine Highway Commission*, Me., 284 A.2d 894, 898 (1971).

We must begin our analysis by identifying the parcel of land whose value is claimed to be diminished. Because the principals represented by Seven Islands own all of the 25,000 acre township in which the Burpee Brook deer yard is situated, the parcel in question is the entire township. Seven Islands proffers no evidence that the value of this parcel has been diminished. Rather, Seven Islands simply asserts that the value of the land *as timberland* has been destroyed, and hence the value of the land *for any purposes* is zero. Seven Islands bases this claim on the assertion that the only profitable use of the land is timber harvesting.

Thus, Seven Islands' claim is that denial of permission to cut any trees other than dead or dying fir on 432 acres of a 25,000 acre township and a temporary prohibition on cutting on another 118 acres of the same tract renders it substantially useless. This claim must be rejected as a matter of law. *See Opinion of the Justices*, 103 Me. 506, 69 A. 627 (1908).

10. The opportunity to use property for future profit is not such a fundamental attribute of ownership. The "loss of future profits ... provides a slender reed upon which to rest a taking claim. Prediction of profitability is essentially a matter of reasoned speculation that courts are not especially competent to perform." *Andrus v. Allard*, 444 U.S. 51, 66, 100 S.Ct. 318, 327, 62 L.Ed.2d 210 (1980). *See also Ace Ambulance Service, Inc. v. City of Augusta*, Me., 337 A.2d 661, 666–67 (1975).

Even if the parcel involved is considered to be only the 2,700 acre deer yard, Seven Islands has cut or been granted permission to cut 1,112 acres and to engage in some harvesting of an additional 432 acres. In addition, Seven Islands also may further harvest the limited and no-harvest areas depending upon on-the-ground conditions and the course of further deterioration. As discussed above, in "taking" cases there is no place for expectations of future profits except to the extent those expectations are reflected in present market value. In light of the fact that the LURC restrictions are only temporary and limited, we find that Seven Islands has not demonstrated that its land has been rendered useless.

## B. *Due Process*

Seven Islands asserts that because the LURC decision is a "taking," it is also an unreasonable exercise of the state's police power in violation of due process guarantees. Since we find that there was no "taking," the "due process" argument as presented by Seven Islands can be quickly disposed of for that reason alone.

 In any event, separate analysis leads to our rejection of any claim of a due process violation. By the conventional analysis, the requirements of due process in the exercise of the police power [are] analytically separated into three component elements:

1. The *object* of the exercise must be to provide for the public welfare.
2. The legislative *means* employed must be appropriate to the achievement of the ends sought.
3. The *manner of exercising* the power must not be unduly arbitrary or capricious.

(Emphasis in original) *State v. Rush,* Me., 324 A.2d 748, 752–53 (1974). Seven Islands makes no suggestion that LURC violated procedural due process in exercising its statutory power in an unduly arbitrary or capricious *manner.* The first two requirements of due process are equally satisfied.

The preservation of wildlife is a valid *object* for the exercise of the police power, *see State v. McKinnon,* 153 Me. 15, 133 A.2d 885 (1957); and the record amply establishes both the importance in general of a deer wintering habitat to deer survival and the importance specifically of the Burpee Brook deer yard for that purpose. Controlled cutting in that area clearly furthers a legitimate and significant public purpose. The protective district zoning by LURC is also a reasonable *means* for achievement of the object of protecting Maine's deer herd. LURC's FOP 390 displays a careful balancing between the necessities of providing winter cover in a long-existing deer yard, on the one hand, and the interest of the private parties to realize a maximum return from the land, on the other. As the Supreme Court recently noted again in *Penn Central Transportation Co., supra* 438 U.S. at 124, 98 S.Ct. at 2659, government "hardly could go on if to some extent values incident to property could not be diminished without paying for every such change in the law, and . . . [the] government may execute laws and programs that adversely affect recognized economic values." We can find no due process violation in FOP 390.

The entry must be:

Judgment affirmed.

McKUSICK, C. J., and GODFREY, ROBERTS and CARTER, JJ., concurring.

NICHOLS and WATHEN, Justices (concurring).

While we agree with our colleagues in their disposition of the substantive issues, we write separately because it is our view that this action for judicial review should be dismissed for lack of standing in the Petitioner, Seven Islands Land Company. The gravamen of the claim asserted herein is an unconstitutional taking. It is not a claim to be asserted by a manager vicari-

ously. The owners themselves should be in court.[1]

We start with the fundamental principle that courts are instituted to afford relief to persons whose rights have been invaded, or are threatened with invasion, by a defendant's act or conduct, or to give relief at the instance of such persons.[2] A court may appropriately refuse to entertain an action brought by one whose rights have not been invaded or infringed.[3] A party must have some interest in the subject matter of potential litigation to entitle him to maintain an action thereon.[4]

In sum, the question of standing is generally resolved by determining whether the controversy touches upon the legal relations of parties having adverse legal interests and whether the party invoking the court's jurisdiction has a personal stake in the outcome of the controversy.[5] As we declared a few months ago, "A party has standing to appeal a judgment only where the judgment adversely and directly affects that party's property, pecuniary or personal rights."[6] This Petitioner, we submit, cannot meet that test.

Standing is a prudential matter often involving the principle of judicial self-restraint by which the courts avoid interference with other branches of government.[7]

The doctrine of standing insures that the court will have the benefit of truly adverse parties in resolving the controversy. True adverseness sharpens the presentation of issues upon which a court so largely depends for the illumination of difficult questions before it.

Perhaps not in the instant case, but in many cases, there are added benefits derived from the application of this doctrine, just as there is in the application of the real-party-in-interest rule, M.R.Civ.P. 17(a); it assures that the parties are before the court against whom the defendants may wish to assert counterclaims, and against whom the defendants may wish to have available in the future a defense of res judicata.

In the case at bar we must consider the question of standing as it relates to judicial review of administrative action. Here we find the essential principle codified in the statute governing such an appeal as this:

Persons aggrieved by final actions of the commission, including without limitation any final decision of the commission with respect to any application for approval or the *adoption by the commission* of any district boundary or amendment thereto, may appeal therefrom in accordance with Title 5, Chapter 375, subchapter VII. This right of appeal, with respect to any commission action to which

---

1. The Petitioner asserts no claim that it has sustained injury *itself*. Rather the Petitioner avers that it brings this action for judicial review as an *agent* for some thirty-six owners whose names are spread in the caption to the petition but whose respective holdings are nowhere in this record identified or described. We cannot ascertain from the record which of these holdings are involved, and which are not involved, in each of the issues raised. If the Court were persuaded the Petitioner's claim was meritorious, it could not determine from this record the extent to which each of the several owners was damaged. The Petitioner's allegation that there had been an unconstitutional taking of the owners' property is followed by the astonishing prayer that due compensation be paid, not to the several owners for their respective losses, but to the Petitioner.

2. *See generally*, Nichols, "Standing to Sue: The Litigants' Key to the Courthouse Door," 9 Maine Bar Bulletin 1 (Jan. 1975).

3. *Huntington v. Savings Bank*, 96 U.S. 388, 24 L.Ed. 777 (1877).

4. *Bourque-Lanigan Post No. 5, The American Legion, v. Carey*, 148 Me. 114, 117, 90 A.2d 710, 712 (1952).

5. The doctrine of "standing to sue" in the federal courts has its own unique significance, often requiring consideration of whether there is a justiciable controversy within the meaning of Article III, Section 2, of the United States Constitution. *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

6. *Gaynor v. McEachern*, Me., 437 A.2d 867, 871 (1981).

7. *Association of Data Processing Service Organizations, Inc., v. Camp*, 397 U.S. 150, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970).

this right may apply, shall be in lieu of the rights provided under Title 5, section 8058, subsection 1. 12 M.R.S.A. § 689 (1980).

The question before us is whether or not Seven Islands Land Company is a person "aggrieved" by the final action of the Commission.

In the context of appeals from the decisions of other agencies we have had repeated occasions to declare that for a party to have standing to seek judicial review of an administrative order, the party must demonstrate a particularized injury from the order. *Pride's Corner Concerned Citizens Association v. Westbrook Board of Zoning Appeals*, Me., 398 A.2d 415, 418 (1979); *Matter of Lappie*, Me., 377 A.2d 441, 443 (1977).

Seven Islands Land Company has failed on this record to demonstrate a particularized injury to it.[8] The Petitioner is not aggrieved.

Accordingly, we would prefer to decide the case on lack of standing. We would not reach the merits of the controversy.

8. *See generally State v. Board of County Commissioners of the County of Ravalli*, 181 Mont. 177, 180, 592 P.2d 945, 947 (1979) (firm of engineers hired to plat subdivisions lacked standing to seek a writ of mandamus to require approval or disapproval thereof); *Mystic Marinelife Aquarium, Inc. v. Gill*, 175 Conn. 483, 496–97, 400 A.2d 726, 732 (1978) (association owning no real property lacks standing to represent members based on their property interests); *Mueller v. Anderson*, 60 Misc.2d 568, 303 N.Y.S.2d 143, 144 (1969) (notwithstanding custom and practice of permitting neighborhood association to appear before administrative agency, the association was not a proper party to the judicial review).