### AVIATION OIL COMPANY

v.

### DEPARTMENT OF ENVIRONMENTAL PROTECTION.

Supreme Judicial Court of Maine.

Argued Oct. 4, 1990.
Decided Dec. 14, 1990.

**612**

William F. Hufnagel (orally), Hufnagel & Lake, Winthrop, for plaintiff.

Dennis Harnish (orally), Asst. Atty. Gen., Augusta, for defendant.

Before McKUSICK, C.J., and ROBERTS, WATHEN, GLASSMAN, CLIFFORD and COLLINS, JJ.

CLIFFORD, Justice.

Aviation Oil Company (Aviation) appeals from a judgment entered by the Superior Court (Kennebec County, *Brody, C.J.*) affirming a clean-up order issued to Aviation by the Department of Environmental Protection (DEP) and affirmed and adopted by the Board of Environmental Protection (Board) pursuant to the Underground Oil Storage Facilities and Ground Water Protection Act (the Act), 38 M.R.S.A. §§ 561–570 (1989 & Supp.1990).[1] Aviation contends that because the Board's finding that Aviation was in custody or control of the oil[2] when the unlawful discharge occurred lacks the support of substantial evidence, Aviation is not a "responsible party" within the meaning of the Act and not subject to a clean-up order. Aviation also contends that the Board's actions are arbitrary and capricious. We find no error and affirm the judgment.

Between 1963 and February 1985, Aviation owned and operated a retail gasoline service station known as Arbo's Citgo located on Kennedy Memorial Drive in Oakland. An underground oil storage facility consisting of five oil storage tanks, pumps and associated piping was located on the property. In 1984, Aviation began a major renovation of the service station. The work included excavating the blacktop and removing and replacing the underground

1. The findings and purposes of the Underground Oil Storage Facilities and Ground Water Protection Act are set out in 38 M.R.S.A. § 561, which provides in pertinent part as follows:

 The Legislature finds that significant quantities of oil are being stored in underground storage facilities; that leaks and unlicensed discharges from these facilities pose a significant threat.to the quality of the waters of the State, including the ground water resources; that protection of the quality of these waters is of the highest importance....

 The Legislature intends by the enactment of this subchapter to exercise the police power of the State through the Board of Environmental Protection and the Department of Environmental Protection by conferring upon the board and the department the power to deal with the hazards and threats of danger and damage posed by the storage and handling of oil in underground facilities and related activities; to require the prompt containment and removal of pollution occasioned thereby....

2. The term "oil" as used in the Act means "oil, petroleum products and their by-products of any kind and in any form including, but not limited to, petroleum, fuel oil, sludge, oil refuse, oil mixed with other waste, crude oils and all other liquid hydrocarbons regardless of specific gravity." 38 M.R.S.A. § 562(8) (1989). Gasoline is "oil" within the meaning of 38 M.R.S.A. § 562(8).

# 613

tanks, pipes and pumps. Aviation did not notify the DEP about the renovation and Aviation did not formally inspect the old tanks, pipes and pumps removed from the site.[3]

In November 1984, the residents of two homes located across Kennedy Memorial Drive from Arbo's detected gasoline in their water supplies. DEP began an investigation to determine the extent of the contamination and to identify the source. In June 1985, gasoline contamination was reported by a third resident in the area. The investigation continued with periodic water sample analysis of all three residential wells and the water supply at Arbo's station. In addition, the DEP and Aviation conducted pressure tests to detect possible leaks in the newly installed underground tanks and pipes, and the pipes were then excavated and physically examined. Hydrogeological surveys were done to determine the topography of the area and the source of the contamination.

As a result of its investigation and testing, the DEP concluded that the Arbo's service station was the source of the gasoline contamination and that the gasoline was discharged during the period of Aviation's ownership of that location. Aviation disputed the DEP findings, and concluded from its own investigation that the contamination problems experienced by neighborhood residents in 1984 and 1985 were caused by the infiltration of surface water into a spill that occurred during the 1950's,[4] long before Aviation owned and operated the Arbo's station.

In February of 1988, pursuant to 38 M.R.S.A. § 568(3), the DEP issued an order instructing Aviation to replace or restore "the contaminated and threatened ground water supplies at Arbo's and the residential properties" and to take action to stop the spread of contamination. In its order, the DEP found the ground water contamination was the result of gasoline discharged from the underground tanks located at the Arbo's station and that Aviation is a "responsible party" within the meaning of 38 M.R.S.A. §§ 562(10)(A) and (C) (1989).[5] Aviation appealed to the Board pursuant to 38 M.R.S.A. § 568(3)(B), and a full testimonial hearing on Aviation's appeal was held before a Board panel.[6] The Board affirmed the DEP clean-up order and adopted its findings. Aviation appealed to the Superior Court pursuant to 5 M.R.S.A. § 11002 (1989). The Superior Court affirmed the Board's decision and this appeal followed.

 Aviation contends that the evidence is insufficient to support the Board's finding that Aviation was a "responsible party" within the meaning of 38 M.R.S.A. § 562(10). The Board found that Aviation had custody or control of the oil at the time

---

3. Aviation was not then under a legal obligation to notify the DEP before it removed the tanks. *See* 38 M.R.S.A. § 566-A (1989 & Supp.1990). The DEP became involved in this matter on November 24, 1984 after the tanks had been replaced.

4. One of the residents confirmed that there was a spill in the 1950's.

5. 38 M.R.S.A. § 562(10) lists four categories of persons who can be held as responsible parties under the Act, and provides as follows:

"Responsible party" means any one or more of the following persons:
(A) The owner or operator of the underground oil storage facility where a prohibited discharge has occurred;
(B) The person to whom the underground oil storage facility where a prohibited discharge has occurred is registered;

(C) Any person other than those identified in paragraph A or B who caused the prohibited discharge of oil or who had custody or control of the oil at the time of the prohibited discharge; or
(D) Any person who owned or operated the underground oil storage facilities from the time any oil, petroleum products or their byproducts arrived there.
As set out in this subsection, "responsible party" does not include a person who can demonstrate by a preponderance of the evidence that that person neither knew nor had reason to know of the existence of an underground oil storage facility.
Section 562 has since been repealed and replaced. P.L.1989, ch. 865, § 1. *See* new section 562-A(17).

6. Aviation waived its right to have the case considered by the full Board of Environmental Protection.

of the discharge. Section 562(10)(C).[7] In this case involving the appeal of an administrative action, we review directly the action of the Board. *Driscoll v. Gheewalla,* 441 A.2d 1023, 1026 (Me.1982). Under the Maine Administrative Procedures Act, findings of fact by an administrative agency may be overturned only upon a showing by the challenger that they are unsupported by substantial evidence on the whole record. 5 M.R.S.A. § 11007(4)(C)(5) (1964). On review, this court will examine the entire record to determine whether, on the basis of all the testimony and exhibits before it, the agency could fairly and reasonably find the facts as it did. *Hall v. Board of Envtl. Protection,* 498 A.2d 260, 265 (Me.1985); *Gulick v. Board of Envtl. Protection,* 452 A.2d 1202, 1207–08 (Me.1982); *Seven Islands Land Co. v. Maine Land Use Regulation Comm'n,* 450 A.2d 475, 479 (Me.1982). This court will not substitute its judgment for the agency's and the fact that a record contains inconsistent evidence does not prevent the agency's findings from being sustained if there is competent and substantial evidence to support them. *Id.* Our review of the record reveals substantial evidence to support the Board's finding that the unlawful discharge occurred while Aviation was in custody or control of the gasoline.

A DEP laboratory analysis of water samples taken from Arbo's well on January 4, 1985 shows the presence of hydrocarbons chromatographically similar to "unweathered" or fresh gasoline, indicating that the gasoline had been present in the water for no more than a few months. Laboratory analyses of samples taken from all four wells between June 1985 and July 1989 show the presence of MTBE,[8] an octane booster used in gasoline only since 1976. The presence of MTBE suggests that at least some of the contamination occurred during or after 1976. A 1987 hydrogeological survey of the area surrounding the Arbo's station demonstrates that the source of the gasoline leakage was Arbo's service station.

Although Aviation presented some evidence that the contamination could have migrated from the 1950 spill, the presence of conflicting evidence does not invalidate the Board's findings. Viewing the record as a whole, the Board's findings that the gasoline discharge emanated from the underground tanks at Arbo's while Aviation was in custody and control of the tanks is supported by substantial evidence.

■ Aviation also contends that the Board acted arbitrarily and capriciously by accepting as evidence hearsay testimony from a DEP investigator that a worker who assisted in the removal of the old tanks said "something to the effect that ['W]ell you should have been here when we removed the old tanks, you know, there was gasoline in the hole, pure gasoline, and one of those tanks had leaked.[']" The rules of evidence do not apply to an administrative proceeding. 5 M.R.S.A. § 9057(1) (1989). Hearsay testimony is admissable if it is "the kind of evidence upon which reasonable persons are accustomed to rely in the conduct of serious affairs." Section 9057(2). *See Oliver v. Secretary of State,* 489 A.2d 520 (Me.1985). There was no abuse of the Board's discretion in admitting this testimony in the administrative hearing before the Board. Other contentions advanced by Aviation merely restate its sufficiency of the evidence argument concerning whether it is a responsible party and are equally without merit and require no discussion.

As a party responsible for the prohibited discharge within the meaning of 38 M.R.S.A. § 562(10), Aviation was properly or-

---

7. The Board recited that it also relied on 38 M.R.S.A. § 562(10)(A) defining the "owner or operator of the underground oil storage facility where a prohibited discharge has occurred" as a *responsible* party. Aviation does not contest that a discharge occurred at its facility. Aviation's liability as a responsible party could be upheld under section 562(10)(A).

8. Aviation contends that some of the methods used by the DEP to detect the presence of MTBE were unsound. The DEP changed its methodology to satisfy Aviation's concerns and still detected MTBE. Even without the contested MTBE data, the record contains ample evidence to support a finding that the gasoline was discharged during Aviation's ownership of Arbo's.

dered, pursuant to section 568(3), to restore or replace the contaminated water supplies.

The entry is:

Judgment affirmed.

All concurring.