STATE OF MAINE  SUPERIOR COURT
CUMBERLAND, SS Civil Action
Docket No. AP-07-04

2008 FEB 26  P 3: 56

DENISE KANE,

      Petitioner

      v.                                         **DECISION AND JUDGMENT**
                                                    **(M.R.Civ.P. 80C)**
COMMISSIONER OF THE DEPARTMENT
OF HEALTH AND HUMAN SERVICES,

      Respondent


## I. BEFORE THE COURT

This matter comes before the court on petitioner Denise Kane's (Kane) Rule 80C appeal from a decision of the Commissioner (Commissioner) of the Department of Health and Human Services (Department) substantiating Kane for neglect, threat of neglect, emotional abuse, and threat of emotional abuse of two young boys while she was serving as their foster parent.


## II. BACKGROUND AND PROCEDURAL HISTORY

The record in this case provides the following history.

Denise Kane (Kane) was a licensed foster parent in 2003 and 2004. During that time, two boys, DY and JY, were twice placed in her care.[1] Almost immediately after the second placement, the Department caseworker assigned to the boys, Jessica Haskell (Haskell), attempted to schedule a visit with the boys at Kane's home to assess their safety and welfare. Despite attempts to accommodate Kane's work schedule, Haskell

---

[1] DY and JY were with Kane from October 21, 2003 to November 4, 2003 and again from December 31, 2003 until they were removed on March 11, 2004.

was unable to visit the boys in Kane's home until February 2, 2004, over a month after they had been placed with Kane.[2] The children's guardian *ad litem*, Beth George (George), also had difficulty scheduling a time to visit the children, and Kane refused to let George enter her home when she arrived unannounced one morning to see them.[3]

Prior to the home visit, Haskell contacted the children's daycare center on January 30 to schedule a visit to see the boys that day. Haskell spoke with the director of the center, Karen McIlwain (McIlwain), who expressed relief that Haskell had called. According to McIlwain, both boys had a fever and JY had reported vomiting that morning before he was brought to daycare. The center had unsuccessfully attempted to reach Kane so that she could come get the children. McIlwain also told Haskell that it was generally difficult to reach Kane when the boys were ill or injured,[4] and discussed other concerns the center had regarding Kane's care of the children. These concerns included the following: 1) Kane did not provide nutritious lunches for the children even after being informed by the center that their meals were inadequate; 2) Kane dropped the boys off at daycare without informing the staff that they had arrived; 3) Both children had severely dry/chapped skin on their legs, ankles, hands, and face, which was causing pain; 4) On one occasion, DY was dropped off with extremely cold hands that took thirty minutes to warm up while he stood in front of a heater, during which time he cried and said his hands hurt; 5) DY had come to the daycare for five days with a hard, sticky substance in his hair; and 6) When Kane came to the center to pick up JY

---

[2] The record reflects that there were some concerns presented at the home visit regarding Kane's response to a request by Haskell to see the children's room, and her stress level as a new foster parent of three young children, but the caseworkers ultimately determined that the boys were happy and comfortable.

[3] George eventually was able to visit the children on January 16, 2004. On January 28, 2004, she recommended that DHHS consider removing the children from Kane's care after discussions she had with Haskell and the children's biological mother.

[4] McIlwain described an incident where JY had fallen and cut his lip. The center left messages for Kane, but she did not respond to their calls all day. Instead, she picked the children up at 5:30 p.m.

because he was sick, she was very angry to learn that she had to take DY with her as well.

After speaking with McIlwain, Haskell unsuccessfully tried to contact Kane on her cell phone. Kane did not return her calls, but did pick the children up from the daycare at noon. Haskell called the children's medical provider to find out if Kane had taken them in to be seen, but learned that she had not. Haskell then went to Kane's home to see how the boys were feeling, but they were not home. Haskell ended up meeting Kane in the parking lot of the daycare where another foster child that Kane was caring for attended. Kane refused to allow Haskell to come to her home to visit with the boys and told Haskell that she could see them in the parking lot. Kane told Haskell that the boys were not sick, and that she felt like she was being harassed. Haskell noted that the boys looked "active and happy" and that their "foreheads did not feel warm to the touch."

According to reports that were kept by various staff at the children's daycare, there were several incidents that occurred after the January 30 episode that caused them concern. On February 2, a daycare staff member noted that JY had a fever and tried to reach Kane at 1:20 and 1:25 p.m. on both her home phone and cell phone, leaving messages on both. When Kane returned the call, she told the staff member that JY had been fine all weekend and wanted to know how they had taken his temperature. Kane did not pick the children up until 4:05 p.m., as she had to drive to Harrison for work.[5] She took JY to the doctor the next day, and received a note stating that he was "healthy and able to return to daycare."

---

[5] Kane was employed by SafeKids and supervised visits between children and their biological parents. She also transported children to and from those visits.

On February 17, the daycare documented that JY's face was flushed and a small bruise became visible near his eye. His temperature was taken and it was determined that he had a fever. The daycare attempted to call Kane several times. When she returned the call over an hour and a half later, she told the daycare that she didn't think JY had a fever. The daycare noted that she was very upset when she picked him up and that she carried him to the car "as if he were a sack of potatoes." Kane returned JY to the daycare that afternoon with a letter from the doctor stating that JY's temperature was normal. The staff member observed that Kane was "very stern and curt and stormed out." JY then went to lie down on a mat and his temperature was taken. According to the daycare, he still had a fever.

The next morning, JY told a daycare staff member that he did not feel good. His temperature was taken, and he again had a fever. His face was flushed and his ears were red. The daycare called Kane on both her home phone and her cell phone, but she did not return the call until 3:00 p.m., and did not pick the children up until 5:15 p.m. On February 23, a daycare staff member noted that JY came to daycare crying because he had slipped and fallen outside. According to the report, Kane told him to stop his crying and to wipe his feet. JY's hands were bright red and freezing cold.

On March 3, DY complained of an itchy stomach. A daycare staff member noticed that he had a rash that he was scratching. The daycare called Kane several times and left messages for her. JY later said that his ear hurt, and the daycare noted that he had a fever. Again, a staff member left a message for Kane. At noon, Kane arrived to pick up DY and responded sharply when told that she needed to take JY as well. The daycare documented that while Kane was arguing with a staff member, she closed the door in DY's face, leaving him crying outside without a coat and banging on the door. Kane later returned the boys to the daycare at 3:45 p.m. and was told that she

4

needed a note from the doctor stating that DY's rash was only a heat rash before he could return, as the daycare did not have immunization records for the children. According to the report, Kane stormed out of the daycare with DY, stating, "she said you can't stay." Kane left JY at the daycare and he immediately went to lie down. Because the staff considered this behavior to be unusual for JY, they took his temperature and determined that he was still running a fever. The daycare called Kane, who came back with a note for DY's heat rash, and took JY and left.

On March 5, the daycare attempted to contact Kane because DY had a fever and a cough. Kane did not return the calls, so the daycare instead called Haskell, who brought cough medicine and fever reducer to the daycare. Then, on March 9, a daycare staff member noticed that DY had nits and moving lice in his hair. Again, the daycare was unable to reach Kane, who arrived at 4:15 p.m. to pick up the boys. According to the report from the daycare, Kane refused to listen to advice on how to treat lice, stating, "I don't know anything about lice and I don't want to." She refused to take any of the children's belongings with her, telling the staff to just throw it away. When warned that the lice could infest her house if she didn't properly treat them, Kane responded, "I'm sure it will, and I know they got it from here."

Finally, on March 11, Kane dropped the boys off at daycare and refused to wait while the staff checked the boys for lice. The daycare discovered that both boys were still infested.[6] McIlwain then called the Department to report her concerns about Kane's treatment of the children. The boys were brought to the Department, and several attempts were made to reach Kane. After receiving no response, the decision was made to remove the boys from Kane and place them in another foster home. Later that day,

---

[6] The hearing officer ultimately determined that Kane properly treated the boys for lice after listening to expert testimony from Dr. Richard Pollack.

Kane dropped off food and some of the boys' clothing at the Department. The next day, she packed up the remaining items belonging to the boys and left them in her driveway to be picked up by Department staff.

Angel Jamison (Jamison) investigated the complaint made by McIlwain and ultimately notified Kane on September 15, 2004 that the Department had substantiated her for neglect, threat of neglect, emotional abuse and threat of emotional abuse. Kane then requested a paper review of the Department's decision, which was upheld by an independent reviewer. Kane appealed the Department's decision. A hearing was held at four separate times over several months. The hearing officer issued a recommended decision that the Commissioner affirm the Department's substantiation of Kane. The Commissioner issued a final decision in which she adopted the hearing officer's findings of fact and accepted the recommended decision that that Department was correct in substantiating Kane. This appeal followed.

## III. DISCUSSION

### A. Standard of Review.

The court may only reverse or modify an administrative agency's decision if it is based upon "bias or error of law," is "unsupported by substantial evidence on the whole record," is "arbitrary and capricious," or involves an "abuse of discretion" by the agency. 5 M.R.S. § 11007(4)(C)(4)-(6) (2006). The court cannot "substitute its judgment for that of the agency on questions of fact." 5 M.R.S. § 11007(3) (2006). This court also should "not attempt to second guess the agency on matters falling within its realm of expertise," and judicial review is limited to the question of "whether the agency's conclusions are unreasonable, unjust or unlawful in light of the record." *Imagineering v. Superintendent of Ins.*, 593 A.2d 1050, 1053 (Me.1991).

6

## B. Substantial Evidence.

This court will uphold an agency decision "if, on the basis of the entire record before it, the agency could have fairly and reasonably found the facts as it did." *Seider v. Bd. of Exam'rs of Psychologists*, 2000 ME 206, ¶ 9, 762 A.2d 551, 555 (citations omitted). The party challenging an agency decision has the burden to prove "that no competent evidence supports the [agency] decision." *Id.* As the Law Court has articulated, "[s]ubstantial evidence exists when a reasonable mind would rely on that evidence as sufficient support for a conclusion." *Forbes v. Town of Sw. Harbor*, 2001 ME 9, ¶ 6, 763 A.2d 1183, 1186.

Kane argues that the Commissioner's decision[7] is not supported by substantial evidence in the record. She claims that the hearing officer based her decision on the "unsupported allegations" of a day care worker with whom she had a contentious relationship. She also argues that the lay opinions of the day care staff regarding medical matters were given great weight, but that no one bothered to obtain the children's medical records.[8] She further asserts that the opinions of caseworkers, the guardian ad litem, and the investigator were all shaped by false allegations and misinformation.

The Commissioner found that Kane failed to respond appropriately to the daycare when the boys were ill or injured and that she became angry when they expressed concerns regarding the children's health. She also determined that Kane failed to provide adequate clothing or enough nutritious food for the children. Finally

---

[7] Much of Kane's argument is focused on the actions of the hearing officer. However, it is the Commissioner's decision that is the final agency action for purposes of judicial review. *See Green v. Commissioner of the Dep't of Mental Health, Mental Retardation & Substance Abuse Servs.*, 2001 ME 86, ¶ 12, 776 A.2d 612, 616.

[8] There is no indication in the record that Kane tried to subpoena those records pursuant to 5 M.R.S. § 9060(1).

she found that Kane did not nurture or demonstrate affection for the boys. Contrary to Kane's claim that the evidence in the record does not support the Commissioner's decision, there is adequate evidence to show that Kane neglected the needs of the children and was emotionally abusive to them.

The evidence included testimony from McIlwain that the children were sometimes dropped off at the daycare when they were sick, including once when one of the boys had reported vomiting that same morning. She also testified that Kane was difficult to reach when the boys were ill, and that sometimes she would not respond at all. McIlwain also stated that Kane "would often seem very irritated that we would call," and that "[s]he would sometimes be in denial that the boys were actually sick." In addition to McIlwain's testimony, the record contains reports by daycare staff of multiple incidents in which the boys either exhibited symptoms of illness or were injured, and the daycare was not able to reach Kane for prolonged periods of time. The reports also documented negative interactions between Kane and the children, including times when she handled them roughly and yelled at them in front of day care staff.

In addition to the testimony of McIlwain and the reports from the daycare, the hearing officer also heard testimony from Department staff[9] detailing their interactions with Kane and reviewed a copy of the narrative log that was kept by Haskell. The log details the difficulty that Haskell had in reaching Kane, and it also includes much of the same information that is contained in the reports from the daycare. Additionally, it contains statements from Kane expressing her concern about missed time from work as a result of having to care for the children's medical needs. Finally, the hearing officer heard testimony from George, regarding the concerns that she had about Kane's

---

[9] Haskell, Jamison, and Delia St. Cross, Haskell's supervisor, all testified at the hearing.

capacity to properly care for the children. While Kane may dispute the veracity or significance of the evidence presented against her at the hearing, it cannot be said that the decision of the hearing officer, and thus the Commissioner, was not based on substantial evidence.

## C. Commissioner's Decision.

### 1. Evidentiary Challenges

According to the Maine Administrative Procedure Act (APA), "agencies need not observe the rules of evidence observed by courts." 5 M.R.S. § 9057(1) (2007). Moreover, "[a]gencies may exclude irrelevant or unduly repetitious evidence." *Id.* at 9057(2). Admissible evidence "is the kind of evidence upon which reasonable persons are accustomed to rely in the conduct of serious affairs." *Id.* Even hearsay information is admissible if it meets the aforementioned test. *Aviation Oil Co. v. Dep't of Environmental Protection*, 584 A.2d 611, 614 (Me. 1990).

Kane argues that the hearing officer erred when she excluded evidence relating to Kane's care for and relationship with other foster children. She contends that this evidence is relevant to rebut the Commissioner's conclusion that she was non-responsive with DHHS staff and that she did not adequately meet the nutritional, medical and emotional needs of the children. She also asserts that much of the evidence upon which the Commissioner relied was hearsay, but does not identify to which evidence she is specifically objecting.

The Commissioner correctly argues that the hearing officer properly excluded evidence concerning Kane's experiences with other foster children as irrelevant to the issue that was before the officer. The only question to be determined at the hearing was whether the Department was correct in substantiating Kane for abuse or neglect. Thus, the Commissioner properly determined that any evidence concerning Kane's

9

interactions with other foster children or the Department staff responsible for supervising those children is irrelevant to Kane's treatment of DY and JY.

## 2. Proper Substantiation

In her recommended decision, the hearing officer relied on the statutory definition of abuse and neglect to reach the conclusion that the Commissioner should affirm the Department's substantiation of Kane for neglect, threat of neglect, emotional abuse and threat of emotional abuse. Kane argues that the terms "threat of neglect" and "threat of emotional abuse" are "vague and nebulous concepts that provide little or no guidance to a decision-maker." She asserts that the proper substantiation standard is found in the Bureau of Child and Family Services Policy Manual[10] (the Manual) which states: "[a] substantiated finding means that, by a preponderance of the evidence, a parent(s)/caregiver(s) has caused and/or is likely to cause high severity child abuse and neglect. This person is considered a danger to children." Chap. IV. D-1. She claims that the hearing officer and the Commissioner would not have determined that the substantiation was justified if they had reviewed the decision according to the Manual's definition.

The Commissioner argues that the Manual definition of a substantiated finding was not in effect at the time the Department made its initial decision to substantiate Kane.[11] According to the Commissioner, the appropriate standard is found in the statute defining child abuse or neglect as "a threat to a child's health or welfare by physical, mental or emotional injury or impairment, sexual abuse or exploitation,

---

[10] A copy of the Manual can be found at www.maine.gov/dhhs/bcfs/policy/policy.htm.

[11] The effective date of the section cited by Kane is August 10, 2005. The Department's substantiation decision occurred on September 15, 2004. However, the recommended decision of the hearing officer is dated October 20, 2006 and the Commissioner's final decision is dated December 19, 2006. Thus, while the applicable regulation was not in effect at the time of the initial substantiation decision, it was at the time of the Commissioner's final decision.

deprivation of essential needs or lack of protection from these, by a person responsible for the child." 22 M.R.S. § 4002(1) (2007). Because both the hearing officer and the Commissioner used the definition provided in the statute to assess Kane's treatment of the children, the Commissioner asserts that she committed no legal error.

### 3. Adequacy of Findings

A final decision of an administrative agency must contain "findings of fact sufficient to apprise the parties and any interested member of the public of the basis for the decision." 5 M.R.S. § 9061 (2007). Those findings "must be adequate to indicate the basis for the decision and to allow meaningful judicial review." *Carroll v. Town of Rockport*, 2003 ME 135, ¶ 27, 837 A.2d 148, 156.

Kane contends that the hearing officer (and thus the Commissioner) failed to make sufficient findings of fact because she did not identify the reasons why she found the Department's witnesses to be credible, or why she did not find Kane's testimony to be credible. However, the hearing officer did explain in detail the factual conclusions she reached concerning Kane's failure to respond to the daycare or to Department staff, her failure to provide enough nutritious food for the children's lunches, her failure at times to acknowledge that the boys needed medical attention, and her failure to properly nurture the children when they needed affection. Thus, her findings of fact were sufficient for purposes of judicial review. Moreover, as the Law Court has noted, "[t]he proper function of judicial review of administrative action does not involve a fresh determination of credibility." *W. S. Libbey Co. v. Maine Employment Security Comm'n*, 446 A.2d 42, 44 (Me. 1982).

deprivation of essential needs or lack of protection from these, by a person responsible for the child." 22 M.R.S. § 4002(1) (2007). Because both the hearing officer and the Commissioner used the definition provided in the statute to assess Kane's treatment of the children, the Commissioner asserts that she committed no legal error.

### 3. Adequacy of Findings

A final decision of an administrative agency must contain "findings of fact sufficient to apprise the parties and any interested member of the public of the basis for the decision." 5 M.R.S. § 9061 (2007). Those findings "must be adequate to indicate the basis for the decision and to allow meaningful judicial review." *Carroll v. Town of Rockport*, 2003 ME 135, ¶ 27, 837 A.2d 148, 156.

Kane contends that the hearing officer (and thus the Commissioner) failed to make sufficient findings of fact because she did not identify the reasons why she found the Department's witnesses to be credible, or why she did not find Kane's testimony to be credible. However, the hearing officer did explain in detail the factual conclusions she reached concerning Kane's failure to respond to the daycare or to Department staff, her failure to provide enough nutritious food for the children's lunches, her failure at times to acknowledge that the boys needed medical attention, and her failure to properly nurture the children when they needed affection. Thus, her findings of fact were sufficient for purposes of judicial review. Moreover, as the Law Court has noted, "[t]he proper function of judicial review of administrative action does not involve a fresh determination of credibility." *W. S. Libbey Co. v. Maine Employment Security Comm'n*, 446 A.2d 42, 44 (Me. 1982).

Kane also argues that the hearing officer failed to consider the lack of medical evidence that the boys were ever in need of medical attention.[12] However, the hearing officer determined that there was evidence to conclude "Ms. Kane repeatedly failed to respond in a timely fashion to the daycare center's attempts to contact her when the boys were ill, or refused to acknowledge such illness or seek medical care at times." Thus, the issue was not solely that the children needed medical attention; rather, it was also that Kane did not properly respond to daycare staff when they were concerned that the children were ill or injured and might need to see a doctor. As discussed above, there is substantial evidence in the record to support the hearing officer's conclusion.

## C. Did the Commissioner Violate Kane's Right to Due Process of Law?

### 1. Adequacy of Substantiation

When an administrative agency interprets a statute that it is required to administer, that interpretation "will be given great deference and should be upheld unless the statute plainly compels a contrary result." *Davric Me. Corp. v. Maine Harness Racing Comm'n*, 1999 ME 99, ¶ 7, 732 A.2d 289, 293. As noted above, abuse and neglect are defined as "a threat to a child's health or welfare by physical, mental or emotional injury or impairment, sexual abuse or exploitation, deprivation of essential needs or lack of protection from these, by a person responsible for the child." 22 M.R.S. § 4002(1) (2007).

Kane argues that the terms "threat of neglect" and "threat of emotional abuse" are unconstitutionally vague and thus deprive her of her right to due process.[13] She

---

[12] It seems that it would have been difficult for the Department to present medical evidence that the children were in need of medical attention when one of the reasons why they substantiated Kane for neglect is because they claim that she did not take the children to the doctor when it was necessary. If Kane was not taking the children to the doctor, how would there be any medical evidence?

[13] It should be noted that Kane was also substantiated for actual neglect and emotional abuse, and not only the threat of these.

asserts that the lack of definitions for these terms left her without adequate guidance as to what conduct would constitute abuse or neglect. She also claims that the use of such terms by the Commissioner exceeds the scope of her statutory authority. The Commissioner argues that the statutory definition of abuse or neglect includes a threat to a child's health or welfare. Thus, the terms "threat of neglect" and "threat of emotional abuse" constitute a risk to a child's health or welfare by neglect or emotional abuse.

According to the Law Court, "[a] statute is presumed to be constitutional and the person challenging the constitutionality has the burden of establishing its infirmity." *Kenny v. Dep't of Human Servs.*, 1999 ME 158, P7, 740 A.2d 560, 563. A statute is unconstitutionally void only if it "sets guidelines which would force [persons] of general intelligence to guess at its meaning, leaving them without assurance that their behavior complies with legal requirements and forcing courts to be uncertain in their interpretation of the law." *Me. Real Estate Comm'n v. Kelby*, 360 A.2d 528, 531 (Me. 1976). However, a statute is "not unconstitutionally vague merely because it does not delineate precise instances of proscribed conduct." *Id.* Thus, the statutory definition of child abuse and neglect does not have to list every possible way in which a person might abuse or neglect a child; rather, it need only put the average person on notice of the type of treatment that would constitute child abuse and neglect.

### 2. Meaningful Review by Commissioner

The Law Court has "stated many times that due process does not require that the decision-maker in an administrative hearing hear or read all the testimony." *Green v. Comm'r of the Dep't of Mental Health, Mental Retardation & Substance Abuse Servs.*, 2001 ME 86, ¶ 15, 776 A.2d 612, 617. Rather, the Commissioner can use a hearing officer to hear evidence and make a recommendation "[a]s long as [the Commissioner] both

familiarizes [herself] with the evidence sufficient to assure [herself] that all statutory criteria have been satisfied and retains the ultimate authority to render the decision." *Id.*

Kane asserts that her right to due process was violated because the Commissioner did not have the opportunity to sufficiently review all of the testimony from the hearing. According to Kane, when the Department was preparing the transcript for this appeal, it was discovered that only the first day of the three-day hearing was recorded, and that the tapes from the latter two days were blank. Because Kane did not begin to present her case until late in the afternoon of the first day of the hearing, she argues that the Commissioner could not have heard her testimony or that of her two witnesses.

The Commissioner argues that she had access to all of the exhibits, the parties' closing arguments, the recommended decision of the hearing officer, and the responses and exceptions that were filed by Kane. She contends that although she was not able to listen to all of the testimony from the hearing, she was sufficiently familiar with the evidence that was presented to properly render a final decision.

## IV. DECISION AND JUDGMENT

The clerk will make the following entry as the Decision and Judgment of the court:

A. The record is sufficient to support the Commissioner's findings.

B. The decision of the Commissioner is affirmed.

SO ORDERED.

Dated: __February 26, 2008__        _____
                                             Thomas E. Delahanty II
                                             Justice, Superior Court

14

Date Filed __01-19-07__    __CUMBERLAND__    Docket No. __AF-07-04__
                              County

Action __80C APPEAL__


DENISE KANE                          COMMISSIONER, DEPARTMENT OF HEALTH
                                     AND HUMAN SERVICES




                                 vs.

| Plaintiff's Attorney | Defendant's Attorney |
|---|---|
| KATHERINE R MCGOVERN ESQ<br>THOMAS A KELLEY ESQ<br>PO BOX 547<br>PORTLAND ME 04112-0547 | RENEE GUIGNARD AAG<br>44 OAK ST, 4TH FLOOR<br>PORTLAND, ME 04104-3014<br>822-0260 |

Date of
Entry