2003 ME 2

CREDIT COUNSELING CENTERS, INC., d/b/a CCCS,

v.

CITY OF SOUTH PORTLAND, et al.[1]

Supreme Judicial Court of Maine.

Argued: Jan. 9, 2002.
Decided: Jan. 10, 2003.

1. Elizabeth Sawyer, the Assessor of the City of South Portland, is also a defendant.

David A. Lourie, Esq. (orally), Cape Elizabeth, ME, for plaintiff.

Mary Kahl, Esq. (orally), Corporation counsel, South Portland, ME, for defendants.

Richard P. Flewelling, Esq., Augusta, ME, for amicus curiae.

Panel: CLIFFORD, J., and RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

CLIFFORD, J.

[¶ 1] The City of South Portland appeals from the judgment entered in the Superior Court (Cumberland County, *Warren, J.*) declaring that Credit Counseling Centers (CCCS) is entitled to a charitable tax exemption for its property pursuant to 36 M.R.S.A. § 652(1)(A) (Supp. 2002). CCCS cross-appeals from the judgment entered in the Superior Court (Cumberland County, *Warren, J.*) that denied its Rule 80B appeal and affirmed the decision of the South Portland Board of Assessment Review denying its application for a charitable tax exemption. The City contends that the court's declaratory judgment was based on insufficient evidence to establish that CCCS is entitled to the exemption. CCCS contends in its cross-appeal that the Board of Assessment Review improperly considered prejudicial and incompetent evidence, improperly based its decision to deny CCCS's application for a tax exemption on the source of CCCS's funds, and failed to make sufficient factual findings. We affirm the judgment denying CCCS's 80B appeal, but we vacate the judgment granting CCCS's declaratory relief because the business of CCCS is not "conducted exclusively for benevolent and charitable purpose" within the meaning of section 652(1)(A).

## I. FACTS AND PROCEDURE

[¶ 2] The facts stipulated to in the declaratory judgment proceeding establish the following: CCCS was founded in 1971 to provide credit counseling, debt management services, and consumer education. It is a nonprofit corporation, is tax-exempt for federal income tax purposes under 26 U.S.C. § 501(c)(3) (2001), and is certified by the Maine Attorney General to solicit charitable contributions.

[¶ 3] The clients that CCCS serve fall within three categories. Approximately one-third of the clients have the capacity to address their debt problems without significant assistance. These clients receive budget counseling services only. They are charged a fee for the service on a sliding scale according to their ability to pay, but no client is denied these services because of an inability to pay. There are also some clients whose debt problems are so severe that CCCS helps them only by informing them of their options in bankruptcy.

[¶ 4] The final category of clients are those who have significant debt, but whose problems are manageable. These clients enroll in CCCS's Debt Management Program. Pursuant to this program, CCCS negotiates a debt accommodation on behalf of the debtor with the debtor's creditors. The program provides the debtor with average repayment periods of 48–60 months. CCCS charges the debtors an average fee of $15 per month.

[¶ 5] CCCS is a local affiliate of the National Foundation for Credit Counseling (NFCC). NFCC affiliates, including CCCS, have returned a minimum of $1.6 billion from debtors to creditors each year since 1996. NFCC solicits voluntary contributions from creditors who participate in Debt Management Plans of up to 15% of each payment received.

[¶ 6] CCCS returned $8,801,264 to creditors in 1995, $9,877,179 in 1996, $11,933,638 in 1997, $13,146,614 in 1998, and $16,715,565 in 1999. Creditors normally pay between 8.5% and 9% of the amount collected as a "fair share" contribution to CCCS. Fair share contributions make up approximately 60% of CCCS's revenue.

[¶ 7] CCCS owns real property in South Portland. The property, including the personal property located on it, was assessed by the City of South Portland's Tax Assessor at a value of $821,600. On January 26, 1998, pursuant to 36 M.R.S.A. § 841 (1990 & Supp.2002), CCCS applied to the Tax Assessor for a charitable exemption from property tax under section 652(1)(A). The Assessor denied CCCS's request, and, on March 10, 1999, pursuant to 36 M.R.S.A. § 843 (Supp.2002), CCCS appealed to the South Portland Board of Assessment Review for an abatement for the 1998 and 1999 tax years. After a hearing, the Board denied CCCS's appeal because "CCCS failed to carry its burden of proof that it was organized and conducted exclusively for benevolent and charitable purposes in that significant benefits were accorded to creditors of consumers and such benefits were not merely incidental to any benevolent and charitable purpose that CCCS may have."

[¶ 8] CCCS then filed a complaint in the Superior Court, appealing from the Board's decision pursuant to Rule 80B of the Maine Rules of Civil Procedure. CCCS also brought a plenary action, pursuant to 14 M.R.S.A. §§ 5951–5960 (1980), seeking a declaratory judgment that its property is exempt from taxation under section 652(1)(A). CCCS concurrently filed a motion for determination of future course of proceedings. In that motion, CCCS maintained that the Board was without jurisdiction to determine its tax exempt status,[2] and, therefore, the case before the Superior Court should proceed as an ordinary civil matter, not as an appeal. The City opposed the motion contending (1) that the Board did have jurisdiction, (2) that the court should decline to address the declaratory judgment request, and (3) that the action proceed only as an 80B appeal.

[¶ 9] The parties submitted a list of stipulations and then proceeded to trial in the declaratory judgment action. At the close of the trial, the Superior Court concluded that CCCS's request for abatement with respect to its 1998 taxes would proceed as an 80B appeal, and that it would use the declaratory judgment action to resolve the ongoing dispute between CCCS and the City as to the tax exempt status of CCCS's property. The court entered a judgment declaring that CCCS is entitled to a charitable tax exemption for the years 1999 and beyond. In the 80B appeal, the court affirmed the Board's decision to deny CCCS a charitable tax exemption for the 1998 tax year. The City appealed from the declaratory judgment, and CCCS cross-appealed from the judgment on the 80B appeal.

## II. 80B APPEAL

[¶ 10] CCCS contends that the Superior Court erred by denying its Rule 80B appeal because the Board improperly considered prejudicial and incompetent evidence, based its denial of the abatement request on the source of CCCS's funds, and failed to make required factual findings.[3] We review directly the decision of

2. We have made clear that a party seeking a property tax exemption pursuant to 36 M.R.S.A. § 652(1)(A) has the option of proceeding administratively to seek a tax abatement from the assessors of the municipality, 36 M.R.S.A. § 841, or of seeking a declaratory judgment declaring that the property is tax exempt. *Maine Cent. R.R. Co. v. Town of*

*Dexter,* 588 A.2d 289, 292 (Me.1991) (citing *Berry v. Daigle,* 322 A.2d 320, 324 (Me.1974).)

3. CCCS also contends that the Board erred by requiring it to prove that it comes "unmistakably within the spirit and intent" of the charitable tax exemption. Contrary to CCCS's contention, however, this standard is a correct statement of the law. *See Episcopal*

the Board when the Superior Court acts in an appellate capacity. *See Christian Fellowship & Renewal Ctr. v. Town of Limington,* 2001 ME 16, ¶ 4, 769 A.2d 834, 836.

## A. Incompetent Evidence

■ [¶ 11] The rules of evidence do not generally apply to administrative proceedings unless otherwise provided by statute. 5 M.R.S.A. § 9057(1) (2002). "Hearsay testimony is admissible if it is 'the kind of evidence upon which reasonable persons are accustomed to rely in the conduct of serious affairs.' " *Aviation Oil Co. v. Dept. of Envtl. Prot.,* 584 A.2d 611, 614 (Me.1990) (quoting 5 M.R.S.A. § 9057(2)). A bare claim that an administrative agency has considered questionable evidence is not sufficient to disturb the agency's action. The claimant must show that the agency relied on incompetent evidence and that the claimant was prejudiced thereby. *Maddocks v. Unemployment Ins. Comm'n,* 2001 ME 60, ¶ 12, 768 A.2d 1023, 1026. The record in this case does not disclose such prejudicial error.

## B. Source of CCCS's Funds

■ [¶ 12] CCCS also contends that the Board erred by depriving it of a tax exemption because CCCS receives much of its revenue from the "fair share" contributions of creditors. An organization "may not be deprived of the right of exemption by reason of the source from which its funds are derived." 36 M.R.S.A. § 652(1)(A). Contrary to CCCS's contention, however, the Board made clear that it denied CCCS's application not because of the source of its funds, but because its services significantly benefit creditors and because those benefits are not merely incidental to some benevolent and charitable purpose. Although the Board may not base a denial of an exemption on the

source of an organization's funds, it may consider, as it properly did here, the ultimate beneficiaries of the organization's services. *See* 36 M.R.S.A. § 652(1)(C)(1) ("Any corporation claiming exemption under paragraph A must be organized and conducted *exclusively* for benevolent and charitable purposes.") (emphasis added).

## C. Sufficiency of Findings

■ [¶ 13] The Board made, among others, the following findings of fact:

19. CCCS provides services that are beneficial to creditors.

20. The benefit provided to creditors is not merely incidental to any charitable purposes for which CCCS may be organized and conducted.

CCCS contends that these findings are insufficient under *Christian Fellowship & Renewal Ctr. v. Town of Limington,* 2001 ME 16, 769 A.2d 834, because they are conclusory. In *Christian Fellowship,* we vacated the judgment of the Superior Court that affirmed the decision of the York County Commissioners denying a tax abatement because the Commissioners failed to make findings sufficient to appraise the court or the parties of the basis for their conclusion. *Id.* ¶ 10, 769 A.2d at 839–40. In that case, the Commissioners failed to make findings of fact regarding whether the organization was a benevolent and charitable institution and whether the organization used or occupied the property exclusively for charitable and benevolent purposes. *Id.* ¶ 9. The Board's findings in this case, however, are sufficient to show the basis for its decision and for effective judicial review.

## III. DECLARATORY JUDGMENT

■ [¶ 14] South Portland contends that CCCS did not carry its burden of

*Camp Found., Inc. v. Town of Hope,* 666 A.2d      108, 110 (Me.1995).

proving, in the declaratory judgment proceedings, that it is entitled to a charitable tax exemption. "Whether an organization's real property qualifies for a charitable tax exemption is a mixed question of law and fact." *Cushing Nature & Pres. Ctr. v. Town of Cushing*, 2001 ME 149, ¶ 10, 785 A.2d 342, 345. Because the material facts of the present case are undisputed, we review the Superior Court's legal conclusions de novo. *Hoag v. Dick*, 2002 ME 92, ¶ 7, 799 A.2d 391, 393.

[¶ 15] By statute, "[t]he real and personal property owned and occupied or used solely for their own purposes by benevolent and charitable institutions incorporated by this State" is exempt from taxation. 36 M.R.S.A. § 652(1)(A). One of several conditions on such an exemption is that the corporation seeking an exemption "must be organized and conducted exclusively for benevolent and charitable purposes." 36 M.R.S.A. § 652(1)(C)(1).

> When an exemption is claimed, the court must undertake a careful examination of the facts presented to determine (1) whether the owner of the land is organized and conducting its operation for purely benevolent and charitable purposes in good faith; (2) whether there is any profit motive revealed or concealed; (3) whether there is any pretense to evade taxation; and (4) whether any production of revenue is purely incidental to a dominant purpose that is benevolent and charitable.

*Cushing Nature and Pres. Ctr.*, 2001 ME 149, ¶ 17, 785 A.2d at 347.

[¶ 16] As an exemption to taxation, section 652 must be strictly construed because " '[s]uch privileges are in conflict with the universal obligation of all to contribute a just proportion toward the public burdens.' " *Episcopal Camp Found., Inc. v. Town of Hope*, 666 A.2d 108, 110 (Me. 1995) (quoting *City of Bangor v. Rising Virtue Lodge, No. 10*, 73 Me. 428, 433 (1882)). The party seeking an exemption "must establish that its organization comes 'unmistakably within the spirit and intent of the act creating the exemption.' " *Id.* (quoting *Holbrook Island Sanctuary v. Town of Brooksville*, 161 Me. 476, 214 A.2d 660, 664 (1965)).

[¶ 17] In the present case, the Superior Court erred in its legal conclusion that CCCS is entitled to a charitable tax exemption. In 1995, CCCS collected $8,801,264 for the creditors of the clients with whom it works; in 1996, it collected $9,877,179; in 1997, it collected $11,933,638; in 1998, it collected $13,146,614; and in 1999, it collected $16,715,565. These creditors normally pay between 8.5% and 9% of the amount collected as a "fair share" contribution to CCCS. The magnitude of the amounts collected for creditors clearly demonstrates that CCCS's business is not "conducted *exclusively* for benevolent and charitable purposes." 36 M.R.S.A. § 652(1)(A) (emphasis added), or that the revenue generated is not "purely incidental to a dominant purpose that is benevolent and charitable," *Cushing Nature & Pres. Ctr.*, 2001 ME 149, ¶ 17, 785 A.2d at 347. CCCS is a thriving organization that provides a significant and very valuable public service to creditors and debtors. CCCS has not shown, however, that it comes "unmistakably within the spirit and intent" of the charitable exemption statute. *Episcopal Camp Found. Inc.*, 666 A.2d at 110 (quotations omitted).

The entry is:

Judgment on the 80B appeal is affirmed. Judgment granting declaratory relief is vacated and remanded for entry of judgment for the City of South Portland.

DANA, J., dissenting.

[¶ 18]   Because I believe that the benefit (if any) CCCS accords its clients' creditors is incidental to CCCS's charitable and benevolent purpose, I respectfully dissent.

[¶ 19]   The Court concludes that CCCS's business is not conducted exclusively for charitable and benevolent purposes because of the large quantity of money CCCS returns to creditors. I disagree with this conclusion for two reasons. First, it is not clear the money CCCS returns to creditors actually represents a benefit to creditors. Second, assuming that it does, this benefit is incidental to CCCS's dominant charitable and benevolent purpose.

## I.   BENEFIT

[¶ 20]   CCCS's payments to creditors on behalf of its clients are not clearly a benefit to creditors. It is true that from 1995 to 1999, CCCS facilitated payments to creditors totaling $60,474,260; however, these payments represent only a portion of the money already owed these creditors. In facilitating payment arrangements for clients, CCCS asks creditors to make "concessions," to which they frequently agree. These concessions include accepting minimum monthly payments that represent the client's "best effort," reducing interest rates, and stopping both late fees and over-the-credit-line fees. Many "firing line" collectors view CCCS as taking away their ability to bring accounts current and are reluctant to work out arrangements with CCCS despite upper management's public support for CCCS. Creditors appear to support CCCS for three reasons: (1) guilt over impersonally granting credit to many customers who are not financially worthy; (2) political and public relations reasons; and (3) recovering some money that might otherwise be lost in bankruptcy.

[¶ 21]   It can be inferred then, that CCCS is returning less revenue to creditors than clients actually owe. It is not clear, however, whether creditors are receiving more or less than they could actually collect on their own (after the costs of collection). Regardless, if there is any monetary benefit to creditors, it is significantly less than $60,474,260 because creditors would likely have recovered a substantial portion of that amount without CCCS's intervention.

## II.   INCIDENTAL BENEFIT

[¶ 22]   Even if some portion of the payments CCCS facilitates are a benefit to creditors, CCCS is entitled to a charitable tax exemption because the benefit is incidental to CCCS's charitable and benevolent purpose. Although exemptions to taxation must be strictly construed, and those entitled to a charitable exemption must be organized and conducted exclusively for benevolent and charitable purposes, this rule of construction has not prohibited us from entitling organizations to charitable tax exemptions when an organization's activities confer only an incidental non-charitable benefit. *See, e.g., Town of Poland v. Poland Spring Health Inst., Inc.,* 649 A.2d 1098, 1100 (Me.1994); *Maine AFL–CIO Housing Dev. Corp. v. Town of Madawaska,* 523 A.2d 581, 584 (Me.1987); *Maine Med. Ctr. v. Lucci,* 317 A.2d 1, 2 (Me. 1974); *Ferry Beach Park Ass'n of Universalists v. City of Saco,* 127 Me. 136, 138, 142 A. 65, 66 (1928).

[¶ 23]   Here, the record provides ample evidence to support the Superior Court's determination in the declaratory judgment proceeding that the benefits (if any) creditors receive are incidental to CCCS's charitable and benevolent purpose. CCCS's stated mission is to provide budget counseling and debt counseling for

Maine families that are experiencing financial distress. To realize its mission, CCCS provides financial counseling and develops action plans for all clients, numbering between six and eight thousand per year. CCCS facilitates payments to creditors for only approximately one-third of its clients. Other clients are either provided action plans they can administer themselves or referred to other agencies for assistance in exploring options like bankruptcy. CCCS administered debt management plans are CCCS's last alternative for its clients. The payments CCCS makes as a conduit for one-third of its clients are, therefore, incidental to its overall purpose of providing budget counseling and debt counseling for Maine families.

[¶ 24] Because the Court focuses on the relationship between CCCS and the creditors of one-third of CCCS's clients, it overemphasizes the role of this relationship, supporting an interpretation of the relationship as central rather than incidental to CCCS's primary purpose. Consideration of CCCS's total activities, however, reveals the incidental nature of these payments and properly places the role of this portion of CCCS activities in context.

[¶ 25] Two-thirds of the consumers CCCS assists do not use CCCS as a payment facilitator. CCCS also provides a large number and wide variety of educational programs to clients, schools, and businesses. In fact, consumer education is a "mandate" of CCCS' service. In 2000, it provided approximately 850 educational programs, 600 of which it provided to schools.[4] CCCS also counsels first-time homebuyers, provides reverse mortgage counseling for seniors, and supplies educational materials for the State.

[¶ 26] CCCS is distinguishable from other "non-profit" credit counseling services that do operate for the purpose of benefiting creditors. It is accredited by the National Foundation for Credit Counseling (NFCC) through a year and a half long process and is re-evaluated every four years to insure that CCCS "clearly [is] in all respects in business to aid the consumer." This process involves compliance with eight policies, including a policy of placing clients on debt management plans only when it is in the clients' best interest and will not result in the client paying "indefinitely." Compliance with NFCC policies demonstrates CCCS's consistent prioritization of its clients' interests above creditors' interests. NFCC accreditation is meaningful. Organizations have lost their accreditation when they refused to handle payments to creditors who would not fund them because NFCC believes "[the organization] cannot be benefiting the consumer if [it is] trying to negotiate deals that are otherwise in their best interest so that [they] can make money."

[¶ 27] Here, the magnitude of payments CCCS provides creditors may tempt one to conclude that the payments are central to CCCS's purpose. When, however, the relationship between CCCS and creditors is placed in its proper context, it is evident that the benefit (if any) to creditors is incidental to CCCS's primary charitable and benevolent purpose.

[¶ 28] The Court also fails to consider two key factors in the exemption analysis: whether CCCS alleviates a public need that government would otherwise have to fulfill, and whether CCCS' services are open to the "indefinite public." Whether an organization fulfills a public need is key to the exemption analysis because it relates directly to the broader justification

---

4. CCCS charges a modest, maximum $100, fee for programs it provides businesses but provides schools with free educational programs.

for the exemption, the quid pro quo for public services rendered. *See Episcopal Camp Found. Inc.,* 666 A.2d at 111 (Glassman J. dissenting) (citing *Y.M.C.A. of Germantown v. City of Philadelphia,* 323 Pa. 401, 187 A. 204, 210 (1936); *Poland Spring Health Inst., Inc.* 649 A.2d 1098; *Maine AFL–CIO Housing Dev. Corp.,* 523 A.2d 581; *Camp Emoh Assoc. v. Inhabitants of Lyman,* 132 Me. 67, 166 A. 59 (1933); *City of Bangor v. Rising Virtue Lodge,* 73 Me. 428 (1882)).

[¶ 29] The Superior Court found that "by educating and assisting persons laboring under significant consumer debt, CCCS is alleviating a public need that otherwise might require various forms of governmental assistance and intervention." The record reveals facts sufficient to support the Superior Court's conclusion. Witnesses testified that the counseling CCCS provides first-time home buyers fulfills a pre-qualification requirement for a State program, reverse mortgage counseling for seniors is offered as part of a federal program, and CCCS provides both educational programs for the State and State access to all of CCCS's materials for use in State programs. Moreover, CCCS often refers clients to a wide variety of other agencies for assistance, including CAP agencies for fuel assistance, the Volunteer Lawyers' Project for legal assistance, Ingraham Volunteers for suicide counseling, and agencies for substance abuse counseling. It develops proposals that clients submit in small claims court, the majority of which, according to testimony, are ultimately accepted (thereby lessening the burden on judicial resources). Finally, CCCS provides budget counseling to all its clients, and appears to be the only organization in Maine providing this type of service (A.46).[5] In other states, these kinds

of financial counseling services are often provided by multi-service charities (like Catholic Charities and the United Way) because financial difficulties are often related to other problems, such as substance abuse and domestic violence.

[¶ 30] Similarly, the Court has not addressed what we have determined to be an essential feature of a public charity, whether it is open to the "indefinite public." *Rising Virtue Lodge,* 73 Me. at 434 ("The essential features of a public charity, are, that it is not confined to *privileged individuals,* but is open to the indefinite public."). The Superior Court found that CCCS demonstrated that it intended to benefit an indefinite number of people and the record sufficiently supports this conclusion. Credible testimony indicated that no one has ever been turned away for inability to pay fees and at least twenty-five percent of counseling sessions require no fees.

[¶ 31] For these reasons, I would affirm the judgment granting CCCS declaratory relief. I would also affirm the Superior Court's decision regarding the 80B appeal and abatement for the tax year 1998. Although seemingly inconsistent, such a conclusion is supported by our limited standard of review and the apparent sufficiency of the evidence with respect to the Board's finding for the tax year 1998.

---

5. Testimony indicated that in the 1970s, the State provided this type of service through the University of Southern Maine Extension Service.