2006 ME 44

**CHRISTIAN FELLOWSHIP AND RENEWAL CENTER**

v.

**TOWN OF LIMINGTON et al.**

Supreme Judicial Court of Maine.

Argued: April 27, 2005.
Reargued: Jan. 25, 2006.
Decided: April 28, 2006.

its property qualify it for exemption from property taxation pursuant to 36 M.R.S. § 652(1)(A), (C) (2005). Because of errors in the County Commissioners' analysis of the governing law and because, as a matter of primary jurisdiction, the County Commissioners should have the opportunity to consider joint stipulations presented in the first instance on appeal to the Superior Court, we vacate and remand.

Stephen C. Whiting, Esq. (orally), The Whiting Law Firm, P.A., Portland, for plaintiff.

Bruce A. McGlauflin, Esq. (orally), Petruccelli, Martin & Haddow, LLP, Portland, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, DANA, ALEXANDER, CALKINS, LEVY, and SILVER, JJ.*

Majority: CLIFFORD, DANA, ALEXANDER, and SILVER, JJ.

Dissent: SAUFLEY, C.J., CALKINS, and LEVY, JJ.

Dissent: SAUFLEY, C.J.

ALEXANDER, J.

[¶ 1] The Christian Fellowship and Renewal Center (CFRC) appeals from the judgment of the Superior Court (York County, *Fritzsche, J.*) affirming a decision of the York County Commissioners that denied CFRC's petition for a property tax exemption and abatement of taxes imposed upon most of its property in Limington. CFRC asserts that it is a benevolent and charitable organization and that its uses of

## I. CASE HISTORY

[¶ 2] CFRC owns approximately ninety acres of land in Limington.[1] The land was acquired in the late 1980s. CFRC has been operating since approximately 1992. For 1996, the Town imposed real estate taxes of $2783.26 on CFRC's property. CFRC applied to the Town for an abatement of these taxes, contending that the property qualified for a benevolent and charitable exemption pursuant to 36 M.R.S. § 652(1)(A). The Town found that CFRC, as an organization, qualified for the exemption, approved the exemption request, and granted an abatement for CFRC's principal meeting center and three acres of surrounding land. However, the Town denied the exemption request and abatement for the remainder of CFRC's property, including a farmhouse, a caretaker's house, and approximately eighty-eight acres of land that was used for recreational purposes connected to activities at the meeting center.

[¶ 3] CFRC appealed the Town's decision to the York County Commissioners pursuant to 36 M.R.S. § 844 (2005). The County Commissioners denied CFRC's exemption and abatement request. Upon CFRC's appeal pursuant to M.R. Civ. P.

---

* Justice Paul L. Rudman sat at the first oral argument of this case and participated in initial conferences about the case, but retired prior to publication of the opinion.

1. The record contains differing statements regarding the amount of land owned by CFRC. Those differences are not significant for resolution of the issues in this case.

80B, the Superior Court (*Brennan, J.*) affirmed the County Commissioners' decision. Upon CFRC's appeal to us, we vacated and remanded for further fact-findings. *Christian Fellowship & Renewal Ctr. v. Town of Limington*, 2001 ME 16, 769 A.2d 834.

[¶ 4] On remand, a further hearing was conducted before the County Commissioners, and the County Commissioners again issued a decision affirming the Town's denial of the exemption and abatement request. On an initial appeal of that decision, the Superior Court (*Brennan J.*) remanded for further fact-findings to resolve a number of issues raised by both parties as needing clarification. The County Commissioners then conducted a further hearing and, in January 2004, issued another decision with the same result.

[¶ 5] On the third appeal to the Superior Court, the parties identified several problems with the County Commissioners' January 2004 decision. With the approval of the Superior Court, the parties entered into a consent order that (1) determined that a number of the stated findings in the County Commissioners' decision were not findings; (2) indicated that other findings were findings; (3) clarified some findings and conclusions; and (4) most significantly, added a separate stipulation of the facts "identifying certain facts that are undisputed and based on the record."

[¶ 6] As a result, it has been stipulated that CFRC's exemption request was denied because the County Commissioners concluded that: (1) CFRC's purposes, which included use for religious purposes, did not meet a prerequisite for exemption "requiring use solely for exempt purposes"; (2) CFRC's uses of its real estate were not "solely for charitable and benevolent purposes"; and (3) CFRC failed to

demonstrate that the uses of the property at issue provide a significant public benefit or service that government would otherwise provide, "therefore negating the requirement of quid pro quo."

[¶ 7] Relying on the consent agreement that substituted for the County Commissioners' decision and the new stipulations of fact, the Superior Court affirmed the denial of CFRC's exemption request. In its opinion, the Superior Court correctly stated that a religious organization such as CFRC can qualify for a benevolent and charitable exemption for its property if it is "organized and conducted exclusively for benevolent and charitable purposes." The court further observed:

> If a religious organization performs an act of charity which also meets a need which government programs or services address, then an exemption is warranted. If the religious organization instead meets a religious need which government cannot and should not meet, then an exemption is not warranted.

[¶ 8] This statement appears to disqualify religious related charitable activities from receiving the exemption, because the government cannot engage in religious activities. With this statement, the Superior Court affirmed the County Commissioners' conclusion that because CFRC provided recreation, retreat, and renewal activities primarily for religiously-affiliated groups, CFRC did not provide a service that government might otherwise provide and accordingly did not qualify for the benevolent and charitable tax exemption. CFRC then brought this appeal.

## II. THE AGREED STIPULATIONS

■ [¶ 9] The facts and conclusions stipulated by the parties in the Superior Court form the basis for the Superior Court's ruling in this matter.[2] The Town's brief to

---

2. While M.R. Civ. P. 80B(e) does permit par-
ties to "submit stipulations as to the record,"

us recognizes that this stipulation "succinctly summarizes those facts supporting the [d]ecision that are most relevant to this appeal." Although fact-findings are normally reviewed deferentially, we review de novo for errors of law when the parties stipulate or do not dispute the factual findings. *Trask v. Devlin*, 2002 ME 10, ¶ 14, 788 A.2d 179, 182.

[¶ 10] The findings and conclusions of the York County Commissioners that the parties agree should be considered on this appeal indicated that:

1.  CFRC was exempt from income taxation "as a non-profit corporation engaged in the ministry."

2.  The "raw land" of the property was "used for retreat/renewal by affiliated religious organizations."

3.  CFRC charged a "nominal rate" for use of the facility.

4.  The persons using the caretaker's cottage are responsible for security and maintenance of the property, meal preparation for groups using the property, and collection and distribution of donated foods.

5.  While CFRC provides a public benefit by distributing food to the needy, the property at issue is not used for this purpose, "therefore negating the requirement of quid pro quo."

6.  CFRC's purposes, including service for religious activities did not meet the prerequisite for exemption "requiring use solely for exempt purposes."

7.  CFRC failed to demonstrate that it provides a significant public benefit or a service that government would otherwise provide.

8.  CFRC failed to demonstrate that its organization and the uses of its real estate was "solely for charitable and benevolent purposes."

[¶ 11] After recounting the history of CFRC's acquisition of the property, its taxation and applications for abatement, the stipulations adopted by CFRC and the Town stated as follows:

5.  According to both its Articles of Incorporation and By-laws, CFRC's purposes are limited to providing religious, charitable and/or educational services within the meaning of § 501(c)(3) of the Internal Revenue Code of the United States.[3] CFRC was exempt from federal income taxation under Title 26 U.S.C. § 501(c)(3) in 1996, and had been since March of 1989.

6.  More specifically, in 1996 CFRC's purpose and reason for existence was to help fundamentalist, bible-believing churches and individuals both physically and spiritually, including but not limited to pastors and church members. It did this in two ways. First, it existed to provide food to needy families in northern York County. In 1996 it distributed food to needy families which CFRC estimated was worth $300,000.00 (retail value). And second, in 1996 CFRC existed to provide support to churches, church groups, religious organizations, pastors, and church members by making its real estate and facilities available to them for low rates.

this process should not be used to replace administrative decisions or add to the record on appeal facts not considered, in the first instance, by the administrative agency. Correction or stipulation of the record provisions in the rules are not intended to permit addition to the record of new facts or materials, or

replacement of the fact-finder's decision with one more to the liking of the parties, without the fact-finder's consent. *See Beane v. Me. Ins. Guar. Ass'n*, 2005 ME 104, ¶¶ 9–12, 880 A.2d 284, 286–87.

**3.** 26 U.S.C.A. § 501(c)(3) (West Supp.2005).

7. In 1996 CFRC advertised that its real estate and facilities were available to: ... "all fundamental, evangelistic, Bible-believing churches and individuals for Christian-related activities." CFRC would consider allowing other Judeo–Christian groups to use its facilities as well, but none have used the facilities.

8. In 1996 CFRC used its main center building only in connection with its two purposes. It brought food to a room in that building from grocery stores, repackaged the food, and then distributed it to needy families. It also rented that building to numerous churches, church groups, religious organizations, and pastors.

9. In 1996, CFRC charged groups $6.00 per person per night's lodging, and $10.00 per person for three meals a day. If individuals could not afford to pay these rates, CFRC let those individuals come for free. The fees charged by CFRC did not cover its expenses ... which meant that CFRC had to rely upon charitable donations to meet the remainder of its expenses.

10. CFRC's gross revenues in 1996 were $28,191.50 ... $13,020.47 of which came from charitable donations; $14,726.90 of which came from renting its facilities to churches, church-related groups, religious organizations, and pastors; and the remaining $444.13 from miscellaneous sources connected with the rental of its facilities to those churches and groups.

11. In 1996 CFRC had business expenses and deductions totaling $32,587.57 ... meaning that it had a net loss that year of $4,396.07.

12. Some groups that used CFRC's main center building also used the rest of its land. In the warmer months, these groups would use the beach, play ball on the ball field, and hike and camp all around the grounds. During the winter months the groups would ice skate on the pond, and cross country ski and snowmobile throughout the grounds. In 1996, CFRC's 88 acres of land were used for no other purpose, other than by these groups.

13. In 1996 CFRC allowed a minister and his family to live in the farmhouse free of charge. In addition, the farmhouse was used for over flow lodging when there were not enough beds in the main center building to lodge an entire group. The farmhouse was used for no other purposes in 1996.

14. In 1996 the caretaker's house was inhabited by ... the caretakers for CFRC. [The caretakers] kept an eye on the property and facilities to keep them from being vandalized. In addition, they were in charge of maintaining the property, and cooking and cleaning for groups that used the center. [They] did not pay any rent to live in the caretaker's house, and were not paid any compensation for serving as the caretakers.

15. According to the CFRC's by-laws, its directors are referred to as "Directors of the Ministry" and must be Christians.

16. Each group using the Center's facilities is "responsible for its own program, schedule and activities apart from meals and housing."

17. Some of the activities that the Center makes its facilities available for include: conventions, conferences, seminars, and anniversaries, family reunions, family vacations, baby showers, and bridal showers.

### III. OUR CHARITABLE EXEMPTION JURISPRUDENCE

[¶ 12] To qualify for a benevolent and charitable property tax exemption, an ap-

plicant for exemption must demonstrate that two criteria are met. First, the property must be "owned and occupied or used solely for their own purposes by benevolent and charitable institutions." 36 M.R.S. § 652(1)(A). Second, the institution claiming the exemption "must be organized and conducted exclusively for benevolent and charitable purposes." 36 M.R.S. § 652(1)(C)(1) (2005).

[¶ 13] In reviewing benevolent and charitable exemption issues, the word "benevolent" is construed as synonymous with the word "charitable." *Me. AFL–CIO Hous. Dev. Corp. v. Town of Madawaska*, 523 A.2d 581, 584 (Me.1987). Accordingly, for purposes of analysis, the exemption at issue will be referred to as the "charitable" exemption.

[¶ 14] We addressed the meaning of "charitable" or "charity" in *Episcopal Camp Foundation, Inc. v. Town of Hope*, 666 A.2d 108, 110 (Me.1995). There, quoting *Johnson v. South Blue Hill Cemetery Ass'n*, 221 A.2d 280, 287 (Me.1966), we stated that an activity, to be charitable, should be

> for the benefit of an indefinite number of persons, either by bringing their minds or hearts under the influence of education or religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish themselves in life, or by erecting or maintaining public buildings or works or otherwise lessening the burdens of government.

*Episcopal Camp*, 666 A.2d at 110. This language, while sounding somewhat stilted today, indicates that a religiously-affiliated activity may qualify as charitable when it benefits " 'an indefinite number of persons ... by bringing their minds or hearts under the influence of ... religion, by relieving their bodies from disease, suffering, or constraint, by assisting them to establish

themselves in life, or by ... otherwise lessening the burdens of government.' " *Id.* (quoting *Johnson*, 221 A.2d at 287).

[¶ 15] The reference to "an indefinite number of persons" is not a mandate that the activity be open to the public at large. The charitable exemption statute states that the "right of exemption" may not be denied "by reason of limitation in the classes of persons for whose benefit such funds are applied." 36 M.R.S. § 652(1)(A). Thus, an exemption may be available to an organization that limits its benefits to a class of persons defined by a religious affiliation. A religious affiliation or religious purpose of an organization "does not contradict its benevolent and charitable purpose," if its activities would otherwise qualify for the charitable exemption. *Salvation Army v. Town of Standish*, 1998 ME 75, ¶ 5, 709 A.2d 727, 729.

[¶ 16] In reviewing whether a particular organization qualifies for a charitable exemption, we have indicated that the first issue to resolve is whether the organization's stated purpose is charitable within the meaning of the statute creating the exemption. *Cushing Nature & Pres. Ctr. v. Town of Cushing*, 2001 ME 149, ¶ 10, 785 A.2d 342, 345. Where an organization's stated purpose is deemed to be charitable, our analysis proceeds to an examination of the facts related to the organization's activities to determine if those activities qualify as charitable in nature. *See id.* ¶ 10, 785 A.2d at 346.

[¶ 17] In *Town of Poland v. Poland Spring Health Institute, Inc.*, 649 A.2d 1098, 1100 (Me.1994), we characterized an earlier opinion, *Green Acre Baha'i Institute v. Town of Eliot*, 150 Me. 350, 110 A.2d 581 (1954), as "the seminal case for the determination of factual findings required to support a decision of entitlement to a property tax exemption." In *Green*

*Acre,* we outlined the questions to be addressed for a religious organization's qualification for the charitable exemption as follows:

> In each situation where exemption is claimed, there must be a careful examination to determine whether in fact the institution is organized and conducting its operation for purely benevolent and charitable purposes in good faith, whether there is any profit motive revealed or concealed, whether there is any pretense to avoid taxation, and whether any production of revenue is purely incidental to a dominant purpose which is benevolent and charitable. When these questions are answered favorably to the petitioner for exemption, the property may not be taxed.

150 Me. at 354, 110 A.2d at 584. Among the properties ruled exempt in *Green Acre,* were "two undeveloped woodland areas" that were used "for walks, prayer, meditation, outdoor meetings and recreation." *Id.* The property was used only in the summer. 150 Me. at 352, 110 A.2d at 583.

[¶ 18] We have applied the criteria articulated in *Green Acre* to approve charitable exemptions in *Poland Spring Health Institute,* 649 A.2d at 1100, and *Maine AFL–CIO Housing Development Corp.,* 523 A.2d at 584–85. In three recent opinions applying those criteria, organizations allowing use of property at reduced rates for recreation, retreat, and renewal activities, including organizations with a religious affiliation, have been deemed to qualify, or potentially qualify, for the charitable exemption. *See Cushing Nature & Pres. Ctr.,* 2001 ME 149, 785 A.2d 342; *Salvation Army,* 1998 ME 75, 709 A.2d 727; *Episcopal Camp,* 666 A.2d 108.

[¶ 19] *Cushing Nature & Preservation Center* involved an exemption request by a non-profit corporation organized "to own, operate and preserve land as a nature center and/or center for programs for environmental education." 2001 ME 149, ¶ 2, 785 A.2d at 343–44. The property involved was 400 acres of coastal property previously owned by a corporation that had sought and been denied tax-exempt status. *Id.* ¶¶ 2–3, 785 A.2d at 344. The applicant supported its application by asserting that "several" nature-related educational programs occurred on the property in 1998 and 1999. *Id.* ¶ 5, 785 A.2d at 344. The total of uses asserted by the Cushing Nature & Preservation Center in support of its application was minimal: approximately twenty-five days of children's groups camping over a two-year period, a few nature walks, and use of the property by a hospital to study issues relating to Lyme Disease. *Id.* ¶¶ 5–6, 785 A.2d at 344–45. We held that these facts were enough to create a factual dispute entitling the Center to a trial to determine if these minimal uses qualified its 400 acres for a charitable exemption or if, as the Town asserted, the land was really held for noncharitable investment purposes by the individuals who controlled the corporation. *Id.* ¶¶ 16–19, 785 A.2d at 347.

[¶ 20] In *Salvation Army,* we held that a religious organization that operated a summer camp, and allowed its officers and their families, for a nominal fee, to use the camp facilities when not being used as a summer camp, could qualify for a benevolent and charitable exemption. 1998 ME 75, ¶¶ 2, 5, 709 A.2d at 728–29. We determined that allowing Salvation Army officers to use the facilities for personal recreation and lodging was an "incidental use" that did not compromise the overall charitable uses of the property. *Id.* ¶¶ 6–7, 709 A.2d at 729.

[¶ 21] In *Episcopal Camp,* a nonprofit corporation operated a summer camp with a corporate purpose to "carry on moral, cultural, religious and recreational training

and education, instruction in arts and crafts and nature lore, good citizenship, social living and civic responsibility, and to cooperate in community welfare enterprises." 666 A.2d at 108. The camp's weekly schedule was patterned after the Order for Celebrating the Holy Eucharist. *Id.* at 109. In addition to the camp tuition, operating costs for the camp were supported by charitable donations "and income generated by leasing the property in the off-season." *Id.* This income-generating activity on the property in the off-season was not viewed as compromising the benevolent and charitable purposes of the camp or the "solely for their own purposes" limitation in section 652(1)(A). *Id.* at 109–11.

[¶ 22] None of these opinions indicated that a charitable exemption could be denied because the recreational activities supported by the religious or preservation organizations did not provide a service or benefit—a quid pro quo—to offset a government service or benefit.

[¶ 23] The charitable exemption was created in an age when government provided few services and religious institutions and charities provided many services that government neither provided nor subsidized. *See Me. Baptist Missionary Convention v. City of Portland,* 65 Me. 92, 93–94 (1876). Then and now, organizations need not displace government programs in order to serve the common good and qualify for the charitable exemption by providing charitable services to defined groups or to the public at large. One legislative study indicated that the original purposes of the charitable exemption were to promote not only providing services in lieu of government services, but also "providing a service in which the state has a genuine interest." Report of the Joint Standing Committee on Taxation on the Statutory Review of the Property Tax Exemptions

Contained in Title 36, Sections 652 & 656, 14–15 (Feb.1979).

[¶ 24] Whether a charitable activity offsets or displaces a government service is one factor to consider, along with other evidence, in reviewing qualification for a charitable exemption, *see Episcopal Camp,* 666 A.2d at 110 (quoting *Johnson,* 221 A.2d at 287) (" 'or otherwise lessening the burdens of government' "), but the "quid pro quo" factor alone does not control qualification or disqualification for the charitable exemption.

## IV. APPLICATION OF THE LAW TO THIS CASE

[¶ 25] The Town of Limington's agreed stipulations and their arguments to the Superior Court and to us indicate that the Town does not seriously contest that CFRC satisfies most of the above criteria. Review of the charitable exemption criteria our precedents have established over the past half century indicate that the denial of the charitable exemption to CFRC resulted from several errors of law in the analysis of the issue by the County Commissioners and the Superior Court. Let us look at the agreed facts of this case in relation to our charitable exemption jurisprudence.

### A. Organizational Qualification

[¶ 26] Organizational qualification for a charitable exemption is dependent on fact-finding demonstrating that: (1) the organization's stated purpose is charitable within the meaning of the law; (2) the organization is in fact organized and using its property in good faith for its stated purpose; (3) there is no pretense to avoid taxation; (4) there is no profit motive in the organization's activity; and (5) "any production of revenue is purely incidental to a dominant purpose which is benevolent and charitable." *Poland Spring Health*

*Inst.*, 649 A.2d at 1100; *Green Acre*, 150 Me. at 354, 110 A.2d at 584.

■ [¶ 27] The Town cannot seriously dispute CFRC's organizational qualification for the exemption. The record establishes that CFRC received from the Town a charitable exemption for which organizational qualification is a prerequisite. Further, CFRC engages in some endeavors, like food distribution, that the Town does not dispute are "charitable."

[¶ 28] According to the joint stipulation, CFRC's "purposes are limited to providing religious, charitable and/or educational services within the meaning of § 501(c)(3) of the Internal Revenue Code." These stipulated purposes are similar to organizational purposes that we have stated qualify for the benevolent or charitable exemption in the opinions discussed above. *See Episcopal Camp*, 666 A.2d at 108. Notably, CFRC's purposes are more specifically charitable than the "preserve land" and "environmental education" purposes supporting the exemption application in *Cushing Nature & Preservation Center*, 2001 ME 149, ¶ 2, 785 A.2d at 343–44. The County Commissioners did not have the benefit of the joint stipulation in reaching their decision.

[¶ 29] On the other points, there appears no dispute that CFRC is organized and using its property in good faith for its stated purpose; there is no finding of any pretense to avoid taxation; there is no profit motive in CFRC's activity, it is losing money on its operations; and what revenue is generated is purely incidental to a dominant purpose that is benevolent and charitable. Thus, CFRC meets all the organizational criteria we have established to support a charitable exemption. The clarification of CFRC's purposes in the agreed stipulation may be important to the County Commissioners in reviewing organizational qualification for the exemption.

**B. Activity Qualification**

[¶ 30] Turning to the activity criteria we have established, we have held that an organization like CFRC, with stated religious and charitable purposes, qualifies for exemption, *Salvation Army*, 1998 ME 75, ¶ 5, 709 A.2d at 729, and that limiting benefits to persons or groups with a religious affiliation, as CFRC does, will not preclude qualification for exemption, *id.*; 36 M.R.S. § 652(1)(A). We have also held that activities that qualify as charitable do not lose their charitable nature if conducted to serve a religious purpose. *Salvation Army*, 1998 ME 75, ¶ 5, 709 A.2d at 729; *Episcopal Camp*, 666 A.2d at 108–09; *Green Acre*, 150 Me. at 353–54, 110 A.2d at 583–84. .

■ [¶ 31] Addressing intensity of use, we have held that recreation and relaxation activities—even very minimal activities—may qualify as charitable activities supporting a charitable exemption. *Cushing Nature & Pres. Ctr.*, 2001 ME 149, ¶¶ 5–6, 16–19, 785 A.2d at 344–47. For exemption qualification purposes, the fact of a charitable use, not its intensity, is what qualifies for the exemption. *Green Acre*, 150 Me. at 353, 110 A.2d at 583. A charitable use may qualify a property for exemption, even if the property has little human use for recreation or relaxation. *Cushing Nature & Pres. Ctr.*, 2001 ME 149, ¶ 15, 785 A.2d at 346–47.

■ [¶ 32] Even if some intensity of use is a prerequisite for a charitable exemption, CFRC has presented sufficient evidence of such uses in this case. Thus, joint stipulation 12 states:

Some groups that used CFRC's main center building also used the rest of its land. In the warmer months, these groups would use the beach, play ball on the ball field, and hike and camp all

around the grounds. During the winter months the groups would ice skate on the pond, and cross country ski and snowmobile throughout the grounds. In 1996, CFRC's 88 acres of land were used for no other purpose, other than by these groups.

[¶ 33] This stipulated evidence of year-round use of the eighty-eight acres by the twenty-five or so groups and churches using the property demonstrates a use far more intense than the uses deemed to qualify for exemption in *Cushing Nature & Preservation Center,* 2001 ME 149, ¶¶ 5–6, 785 A.2d at 344–45; or *Green Acre,* 150 Me. at 352–54, 110 A.2d at 583–84, and over more seasons than the use deemed to qualify for exemption in *Episcopal Camp,* 666 A.2d at 109, or *Green Acre,* 150 Me. at 352, 110 A.2d at 583. Thus, there is more than sufficient evidence in the record of uses of the property in support of its charitable purposes.

[¶ 34] Continuing the discussion of the activity related criteria that we have established to qualify for a charitable exemption, we have indicated that the statutory restriction to uses "solely for their own purposes" allows incidental, non-charitable uses and living arrangements by staff members and others, without forfeiting the charitable exemption, as long as the "dominant" use is for the charitable purpose. *Salvation Army,* 1998 ME 75, ¶¶ 6–7, 709 A.2d at 729; *Poland Spring Health Inst.,* 649 A.2d at 1099–1100. The use by staff and volunteers at issue here is less significant than indicated in *Poland Spring Health Institute,* and is certainly incidental to and supportive of CFRC's dominant purpose. Further, we have held that even incidental, income producing, non-charitable uses, like the occasional family events on CFRC's property, do not foreclose qualification for a charitable exemption. *Episcopal Camp,* 666 A.2d at 109.

[¶ 35] Finally, and most significant for this case, we have held that any offset of government services is a factor to be considered, but not a mandatory prerequisite, in determining qualification for the charitable exemption. *See id.* at 110. In the decisions below, both the Superior Court and the County Commissioners denied CFRC's exemption application by placing significant focus on conclusions that CFRC's activities, because they are religious in nature, could not fulfill a purported "quid pro quo" requirement that the organization provide a benefit or setoff for services that the government would otherwise provide.

[¶ 36] The "quid pro quo" analysis undertaken by the County Commissioners and the court below is flawed. It suggests that, since government cannot engage in religious activities, no religiously-affiliated recreational activities can offset government services to qualify for the charitable exemption. That view is contrary to our precedents that have approved charitable exemptions for religiously-affiliated recreational activities. As in *Salvation Army, Episcopal Camp,* and *Green Acre,* recreational uses serving a religious purpose can qualify for the charitable exemption. To suggest otherwise risks approving disparate treatment for religiously-affiliated charitable activities compared to other charitable activities.

[¶ 37] To the extent that the "quid pro quo" analysis used by the County Commissioners and the Superior Court suggests that casual and limited group recreational and relaxation activities do not replace or setoff any governmental service, that view is also incorrect. CFRC does provide recreational services that "government would or should otherwise provide." To use the Superior Court's words, CFRC provides its benefits: "by providing something that government would otherwise

provide," through the government system of parks, public lands, and recreational facilities.

[¶ 38] The County Commissioners' decision is also flawed in suggesting that religious purposes or activities cannot be "solely" benevolent and charitable to qualify for exemption and in suggesting that incidental, non-charitable activities on the property by staff members or overseers of the property disqualify the property from receiving the charitable exemption. Our past opinions, discussed above, hold that such a narrow interpretation of "solely" is incorrect as a matter of law.

## V. CONCLUSION

[¶ 39] CFRC's religious affiliation, the religious orientation of the recreational activities on its property, the so-called "quid pro quo" doctrine, and some incidental, non-charitable activities by staff members, overseers, or others do not bar the charitable exemption as a matter of law. The County Commissioners and the Superior Court erred by concluding otherwise. Because the facts are stipulated and undisputed, these errors are errors of law. If our charitable exemption jurisprudence is to be respected and consistently applied, remand for reconsideration in light of the clarified law and stipulated facts is required.

[¶ 40] The County Commissioners are the appropriate fact-finding body in this matter. 36 M.R.S. § 844. Pursuant to the primary jurisdiction doctrine, courts should avoid ruling, on appeal, on matters committed by law to the decision-making authority of an administrative agency before the administrative agency has first had an opportunity to review and decide the facts on the merits of the matter at issue. *See Beane v. Me. Ins. Guar. Ass'n,* 2005 ME 104, ¶¶ 9–12, 880 A.2d 284, 286–87; *Cushing v. Smith,* 457 A.2d 816, 821

(Me.1983); *Levesque v. Inhabitants of Town of Eliot,* 448 A.2d 876, 878 (Me. 1982); *Fletcher v. Feeney,* 400 A.2d 1084, 1090 (Me.1979).

[¶ 41] Here, the better practice would have been for the parties to have developed their stipulations and presented them first to the County Commissioners, prior to their decision. When new evidence or stipulations of fact are developed that would expand a record presented to a fact-finding agency, that evidence or those stipulations should first be presented to the fact-finder for consideration. They should not be presented to an appellate court on review with an invitation to the court to adopt facts or conclusions that an agency, by law, has the primary jurisdiction to decide.

[¶ 42] Accordingly, we vacate the judgment of the Superior Court and remand with direction to remand to the County Commissioners to decide CFRC's request for a charitable exemption and tax abatement for its property, based on the record, including the parties' stipulations (if accepted by the Commissioners), and informed by the law governing the exemption request stated in this opinion and our prior opinions.

The entry is:

Judgment vacated. Remanded for further consideration consistent with this opinion.

LEVY, J., with whom SAUFLEY, C.J., and CALKINS, J., join, dissenting.

[¶ 43] I respectfully dissent.

[¶ 44] The Christian Fellowship and Renewal Center (CFRC) carried the burden to prove to and persuade the York County Commissioners that it came " 'unmistakably within the spirit and intent' of the charitable tax exemption." *Credit Coun-*

*seling Ctrs., Inc. v. City of S. Portland,*
2003 ME 2, ¶ 10 n. 3, 814 A.2d 458, 461;
*see also Episcopal Camp Found., Inc. v.
Town of Hope,* 666 A.2d 108, 110 (Me.
1995). The record evidence paints an un-
certain picture, however, regarding both
CFRC's organizational purpose and its ac-
tual conduct in providing its facilities and
real estate to houses of religious worship
and other religious groups at low rates.
Faced with such uncertainty, the County
Commissioners properly concluded that
CFRC failed to establish that it is "orga-
nized and conducted exclusively for be-
nevolent and charitable purposes" as is
required under our statutory scheme for
exemption from property taxation. 36
M.R.S. § 652(1)(C)(1) (2005). The County
Commissioners' decision should be af-
firmed.

## I. DISCUSSION

[¶ 45] As the Court explains, to qualify
for an exemption as a benevolent and char-
itable institution pursuant to 36 M.R.S.
§ 652(1)(A) (2005), an institution must,
among other things, comply with the stan-
dard set forth in section 652(1)(C)(1) that
requires that the institution "claiming ex-
emption ... be organized and conducted
exclusively for benevolent and charitable
purposes." In determining whether an in-
stitution or organization meets both the
organizational and conduct requirements,
the reviewing authority must undertake a
thorough analysis of the facts. In *Green
Acre Baha'i Institute v. Town of Eliot,* we
stated that

> [i]n each situation where exemption is
> claimed, there must be a careful exami-
> nation to determine whether in fact the
> institution is organized and conducting
> its operation for purely benevolent and
> charitable purposes in good faith, wheth-
> er there is any profit motive revealed or
> concealed, whether there is any pretense

to avoid taxation, and whether any pro-
duction of revenue is purely incidental to
a dominant purpose which is benevolent
and charitable.

150 Me. 350, 354, 110 A.2d 581, 584 (1954).

A. *Organization* Prong of 36 M.R.S.
§ 652(1)(C)(1)

[¶ 46] We examine an institution's stated
purpose when evaluating whether it satis-
fies the organization prong of the exemp-
tion statute. *See Cushing Nature & Pres.
Ctr. v. Town of Cushing,* 2001 ME 149,
¶ 10, 785 A.2d 342, 345–46. Here, the
Court emphasizes that "CFRC's 'purposes
are limited to providing religious, charita-
ble and/or educational services within the
meaning of § 501(c)(3) of the Internal Rev-
enue Code,' " and therefore ultimately con-
cludes that CFRC's organizational purpose
is charitable.

[¶ 47] Simply asking whether an organi-
zation claims to be exempt from federal
income taxation under 26 U.S.C.A.
§ 501(c)(3) (West Supp.2005) to determine
whether it has a stated charitable purpose
grossly oversimplifies the issue for two
reasons. First, § 501(c)(3) affords tax ex-
empt status for a variety of institutional
purposes. Unlike our property tax exemp-
tion statute, § 501(c)(3) does not treat dif-
ferently religious, charitable, scientific, and
literary institutions. To say that an or-
ganization qualifies under § 501(c)(3) says
nothing more than that it *might* qualify for
one of the property tax exemptions recog-
nized in 36 M.R.S. § 652(1) (2005).

[¶ 48] Second, § 501(c)(3) status only il-
lustrates an institution's assertion that it is
entitled to exemption from *income,* not
*property,* taxation; it provides no insight
into the institution's claimed charitable
purpose. Accordingly, we must look be-
yond the general reference to the federal
income tax exemption statute to determine
an organization's stated purpose. *See*

*Harrison v. Barker Annuity Fund,* 90 F.2d 286, 289 (7th Cir.1937) (stating that "[t]he character of the corporation and the purpose for which it [is] organized must be ascertained by reference to the terms of its charter"). Our case law is consistent with this approach in that we focus on what the stated purpose of the institution actually is, not on its asserted tax status. For example, in *Episcopal Camp,* we noted that the organization had a multi-faceted purpose, which was "to maintain camps for both men and women which will carry on moral, cultural, religious and recreational training and education, instruction in arts and crafts and nature lore, good citizenship, social living and civic responsibility, and to cooperate in community welfare enterprises." 666 A.2d at 108 (internal quotations omitted). Similarly, in *Camp Emoh Associates v. Inhabitants of Lyman,* we observed that "[t]he main purpose and design of [Camp Emoh] ... [was] that of acquiring and holding real and personal property for the erection and support of a camp, or camps, to be conducted without profit, for the care, maintenance, and assistance of poor and indigent Jewish children." 132 Me. 67, 69, 166 A. 59, 60 (1933).

[¶ 49] The statement in CFRC's articles of incorporation that its purpose is "limited to providing religious, charitable and/or educational services within the meaning of § 501(c)(3) of the Internal Revenue Code" provides little insight as to whether CFRC satisfies the organizational prong of section 652(1)(C)(1). A more revealing expression of CFRC's organizational purpose appears in the parties' stipulations: "CFRC's purpose and reason for existence was to help fundamentalist, bible-believing churches and individuals both physically and spiritually, including but not limited to pastors and church members." Similarly, in its application for § 501(c)(3) status that was submitted to the County Commission-

ers as an exhibit, CFRC represented that it "plan[ned] to contact churches and let them know of the religious activities that [it] will be conducting, and also [to] let them know that [its] facilities are available for rent so that they can conduct their own religious activities [t]here."

[¶ 50] Accordingly, CFRC does not satisfy the organizational prong necessary to qualify for the charitable exemption simply because it qualifies as a tax exempt organization under the Internal Revenue Code. Organizational purpose under section 652(1)(C)(1) is a broader concept. The record establishes that CFRC is organized to provide physical and spiritual assistance to churches and individuals and to rent its facilities so that others "can conduct their own religious activities." Whether this should be construed as "charitable" or "religious" can be fairly debated. To the extent that CFRC purports to be organized to provide physical and spiritual assistance to others, its purpose can be construed as charitable, as is seen in cases involving missionary societies. *See Green Acre,* 150 Me. at 353, 110 A.2d at 583; *Ferry Beach Park Ass'n of the Universalist Church v. City of Saco,* 136 Me. 202, 204–05, 7 A.2d 428, 429 (1939); *Maine Baptist Missionary Convention v. City of Portland,* 65 Me. 92, 94 (1876) ("It has been repeatedly decided that missionary societies ... are, in a legal sense, charitable institutions."). On the other hand, to the extent that CFRC asserts that it is organized to provide physical and spiritual assistance in the form of providing a venue for the conduct of religious activities, its purpose can be described as religious. *See Pentecostal Assembly of Bangor v. Maidlow,* 414 A.2d 891, 893–94 (Me.1980) (noting that "[i]t is well settled that for purposes of exemption from property taxation, religious purposes are not to be equated with benevolent and charitable purposes.").

Our statutory scheme also reflects this distinction between charitable and religious purposes in that it considers houses of religious worship and religious societies for exemption under a different provision than benevolent and charitable institutions. *See* 36 M.R.S. § 652(1)(A), (G) (2005); *Osteopathic Hosp. of Me. v. City of Portland,* 139 Me. 24, 29, 26 A.2d 641, 643 (1942) (acknowledging that a statutory predecessor to section 652 "place[d] benevolent and charitable institutions in a different category from purely religious institutions").

[¶ 51] The Court's reliance on the Town's decision to grant a partial exemption for CFRC's main building and the surrounding three acres as additional proof that CFRC satisfies the organizational requirement for the remaining buildings and acreage is misplaced. The law does not compel a town to grant a taxpayer an exemption for all of its property if the town determines, for whatever reason, that only a portion of the taxpayer's property qualifies for the exemption. The main building and the surrounding three acres were not part of the abatement request that was considered by the County Commissioners,[4] and the County Commissioners did not conduct a de novo review of the partial exemption granted by the Town to CFRC. Therefore, the County Commissioners, despite that CFRC's distribution of food to the needy constituted a charitable purpose, "voted to deny the pending property tax abatement denial appeal petition."

[¶ 52] The record in this case can be construed to support a determination that CFRC is organized to serve a charitable purpose, a religious purpose, or both.

CFRC carried the burden to establish that it comes "unmistakably within the spirit and intent" of the organizational prong of the benevolent and charitable property tax exemption statute. The record does not compel the conclusion that the County Commissioners erred when they determined that CFRC is "primarily organized ... for religious purposes."

B. *Conduct* Prong of 36 M.R.S. § 652(1)(C)(1)

[¶ 53] In addition to being organized for a benevolent and charitable purpose, an institution must also establish that it is conducted exclusively for a benevolent and charitable purpose. 36 M.R.S. § 652(1)(C)(1). Again, we must undertake a careful review of the facts in making such a determination. *See Green Acre,* 150 Me. at 354, 110 A.2d at 584.

[¶ 54] Just as a stated purpose can be both charitable and religious, an institution's *conduct* may be both charitable and religious. *See Episcopal Camp,* 666 A.2d at 109 (noting that the organization provided religious instruction through a "Faith Development" class but also "conduct[ed] ... traditional summer camp activities"). Nevertheless, section 652(1)(C)(1) requires that the institution be conducted *exclusively* for charitable purposes. Whether "exclusively" should be strictly construed in accordance with its plain meaning is not settled by our decisions. *Compare Credit Counseling Ctrs., Inc.,* 2003 ME 2, ¶ 12, 814 A.2d at 462, *with Town of Poland Spring v. Poland Health Inst., Inc.,* 649 A.2d 1098, 1100 (Me.1994). In considering the nature of an institution's conduct, we

---

4. It is noteworthy, however, that CFRC's initial exemption request to the Town represented that its real estate and personal property were used for the following purposes: "As a house of worship (Title 36 M.R.S.A. § 652(g)) and/or for benevolent and charitable purposes (Title 36 M.R.S.A. § 652(A))." Accordingly, it is possible that the Town viewed the main building and surrounding three acres as exempt as a house of worship pursuant to 36 M.R.S. § 652(1)(G) (2005).

look to the institution's ultimate beneficiaries because they illuminate the nature and scope of that institution's charitable conduct. *See Credit Counseling Centers, Inc.*, 2003 ME 2, ¶ 12, 814 A.2d at 462.

[¶ 55] Here, CFRC primarily provided its facilities and real estate to houses of religious worship and other religious societies at a low rate. None of the users of CFRC's property for retreat and renewal in 1996 were individuals. Moreover, the record does not provide an adequate basis to determine how the organizations that rented the property in 1996 actually used the facilities. Indeed, the findings and stipulations that the Court quotes at length leave one guessing as to what actually occurred at CFRC's facilities in 1996. Consequently, one can only speculate whether those uses were primarily for recreation or primarily for religious observance. What is certain, however, is that the County Commissioners, after a careful review of the record, could reasonably have been unpersuaded that CFRC's conduct in 1996 was exclusively, or even predominantly, for a benevolent and charitable purpose.

## C. Quid Pro Quo

[¶ 56] The Court's analysis relies heavily on the suggestion that the County Commissioners and the Superior Court erred by placing too much emphasis on the lack of a quid pro quo in determining whether CFRC qualifies for an abatement. However, we review the County Commission-

ers' decision directly, and it is clear from their decision that although the County Commissioners treated quid pro quo as a factor in their decision, it was not the sole factor.[5] The Court's suggestion that too much emphasis was placed on the quid pro quo factor is incorrect, and its focus on the Superior Court's application of quid pro quo is inapposite to our review. *See Peregrine Developers, LLC v. Town of Orono*, 2004 ME 95, ¶ 9, 854 A.2d 216, 219.

## D. Conclusion

[¶ 57] The Court concludes that the County Commissioners committed an error of law by denying the exemption because they viewed CFRC's religious affiliation, the religious nature of any recreational activities on its property, the lack of a quid pro quo, and incidental, non-charitable activities on the property, as being an absolute bar to CFRC qualifying for a charitable exemption. Although the County Commissioners' findings and conclusions lack precision, there is no language in their written decision to support the Court's characterization that the County Commissioners treated any or all of the foregoing factors as an absolute bar to qualify for a charitable exemption. Rather, the County Commissioners denied the exemption because, as they stated, CFRC was "primarily organized and conducted for religious purposes" and had "failed to demonstrate that it is organized and conducted solely for benevolent and charitable purposes."

---

5. Although the County Commissioners stated that CFRC "failed to demonstrate that it provides any significant benefit to the general public or the local community or that it provides a service or benefit that the government would otherwise provide," the County Commissioners concluded that CFRC was "primarily organized and conducted for religious purposes to benefit certain religious groups and individuals, ... and [CFRC's] primary use of its property is as rental property for the benefit of such religious groups and individuals." Moreover, the County Commissioners concluded that CFRC "failed to demonstrate that it is organized and conducted solely for benevolent and charitable purposes or that the real estate for which it seeks an exemption is used *solely* for charitable and benevolent purposes."

[¶ 58] The Court's effort to clarify the law governing the charitable exemption in support of its decision to remand this proceeding is unwarranted because the County Commissioners committed no error of law. CFRC bore the burden to prove to the County Commissioners that it came within the spirit and intent of the charitable tax exemption statute. *Credit Counseling Ctrs., Inc.*, 2003 ME 2, ¶ 10 n. 3, 814 A.2d at 461. By providing the County Commissioners with an ambiguous statement of its organizational purpose and an amorphous portrait of its actual conduct, CFRC failed to meet its burden. We should affirm the judgment.

SAUFLEY, C.J., dissenting.

[¶ 59] I concur in the result urged by the dissenting opinion and write separately to address the odd procedural posture of this matter and to note the limited findings upon which I would base the appellate review.

[¶ 60] As the Court's opinion lays out, Christian Fellowship and Renewal Center's challenge to the denial of a tax exemption for a portion of its land has previously been reviewed on appeal. *See Christian Fellowship & Renewal Ctr. v. Town of Limington*, 2001 ME 16, 769 A.2d 834. The result of the first appeal was a remand to the County Commissioners for factual findings sufficient to allow for a complete review on appeal. *Id.* ¶ 19, 769 A.2d and 840–41.

[¶ 61] When the County Commissioners completed their actions on remand, they concluded again that the exemption was not available for the approximately eighty-eight acres outside the area in which the food pantry was run.

[¶ 62] The parties and their attorneys, in a misguided effort to create a more thorough record, then entered into stipulations intended to supplement the County Commissioners' decision. Regrettably, those stipulations were not a part of the County Commissioners' findings and do not reflect the factual findings or conclusions of the County Commissioners.

[¶ 63] Thus, as to this issue, I agree with the majority's comment at footnote 2 clarifying that "[c]orrection or stipulation of the record provisions in the rules are not intended to permit addition to the record of new facts or materials, or replacement of the fact-finder's decision with one more to the liking of the parties," and citing *Beane v. Maine Insurance Guaranty Ass'n*, 2005 ME 104, ¶¶ 9–12, 880 A.2d 284, 286–87.

[¶ 64] Accordingly, distinct from the dissent and the majority, I would not use or rely on those stipulations in any way. Because we must review the findings of the adjudicators, in this case the County Commissioners, not the stipulations of the parties, I would rely only on the County Commissioners' findings. When viewed in light of the law as articulated in the dissenting opinion, those findings are supported by the record, and accordingly, I join in the result urged by the dissenting opinion.